Brody Valerga (USB #11789)
VALERGA LAWYERS
395 South Main Street, Suite 201
Alpine, UT 84004
Telephone: (801) 893-3635
Facsimile: (801) 396-7164
Email: brody@valergalawyers.com
*Proposed Special Counsel for the Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In Re: <br><br> **PLAZA 106, LLC,** <br>    Debtor in Possession. <br> _____ <br><br> **PLAZA 106, LLC,** <br><br>    Plaintiff, <br><br> v. <br><br> **FIRST UTAH BANK, a Utah state-chartered bank; and MICHAEL R. BROWN, in his capacity as Successor Foreclosure Trustee,** <br><br>    Defendants. | Bankruptcy No. 25-bk-25459-PH <br> Chapter 11 <br> Hon. Peggy Hunt <br><br><br><br><br> Adversary Proceeding No. <br> _____ |

**VERIFIED COMPLAINT FOR FRAUD ON THE COURT, CONSPIRACY TO DEFRAUD TRUSTOR, BREACH OF CONTRACT, UCC VIOLATIONS, SPOLIATION OF EVIDENCE, AND INJUNCTIVE RELIEF**

Plaintiff Plaza 106, LLC, by and through counsel, for its Verified Complaint against

Defendants FIRST UTAH BANK, a Utah state-chartered bank; and MICHAEL R. BROWN, in

his capacity as Successor Foreclosure Trustee, alleges as follows:

1

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a). This adversary proceeding is referred to this Court by the standing order of reference of the United States District Court for the District of Utah.

2. This is a core proceeding under 28 U.S.C. § 157(b)(2), including proceedings to determine the validity or extent of a lien (§ 157(b)(2)(K)), proceedings affecting the adjustment of the debtor-creditor relationship (§ 157(b)(2)(O)), and other proceedings affecting the administration of the estate (§ 157(b)(2)(A)).

3. This adversary proceeding is properly commenced under Federal Rule of Bankruptcy Procedure 7001, including: a proceeding to obtain injunctive relief (Rule 7001(7)); and a proceeding to determine the validity, priority, or extent of a lien or other interest in property (Rule 7001(2)).

4. Venue is proper in this District under 28 U.S.C. § 1409(a) because the above-captioned bankruptcy case is pending in this District.

5. This Court has authority to grant the relief requested under 11 U.S.C. § 105(a), Federal Rule of Civil Procedure 60(d)(3) (made applicable by Bankruptcy Rule 9024), and Federal Rule of Civil Procedure 65 (made applicable by Bankruptcy Rule 7065).

## PARTIES

6. Plaintiff Plaza 106, LLC ("Plaintiff" or "Debtor") is a Utah limited liability company and the debtor in possession in the above-captioned Chapter 11 bankruptcy case. The Debtor owns the real property located at 894 East 3900 South, Salt Lake City, Utah 84107 (the "Property").

7. Defendant First Utah Bank ("FUB") is a Utah state-chartered bank with its principal place of business in Salt Lake City, Utah. FUB is the beneficiary under a Deed of Trust recorded on July 20, 2022, encumbering the Property, and is a creditor in the above-captioned bankruptcy case.

8. Defendant Michael R. Brown (USB #16007) ("Brown") is the successor foreclosure trustee under the Deed of Trust encumbering the Property, having been substituted as trustee on October 31, 2024. Brown is also an attorney admitted to practice before this Court and a member of the law firm Parsons Behle & Latimer, and serves as litigation counsel for FUB in the above-captioned bankruptcy case. Brown's claims in this proceeding arise from his conduct in his capacity as trustee.

### GENERAL FACTUAL ALLEGATIONS

9. On July 20, 2022, Plaza 106 LLC entered into a Business Loan Agreement with First Utah Bank in the amount of $2,750,000. (Doc 9-1.)

10. Plaza 106 executed a Promissory Note with a fixed monthly payment of $17,705.57 for 119 payments. (Doc 9-2.)

11. Plaza 106 faced challenges with tenant payments and other issues affecting cash flow. The last regular loan payment was made in July of 2024.

12. Unbeknownst to Plaza 106, FUB sent a Notice of Default and Acceleration on September 25, 2024 (Doc 9-7) and recorded a Notice of Default and Election to Sell on November 1, 2024 (NOD1) (Doc 9-9). Plaza 106 did not become aware of these filings until around the time of January 3, 2025, when Prasad Reddy, Managing Member of Plaza 106, contacted the bank following catch-up payments made by Plaza 106.

3

13. Despite the cashflow challenges, Plaza 106 was focused on catching up on payments. Between October 2024 and January 2025, Mr. Reddy made five separate deposits of $17,705.57 each into Plaza 106's business checking account at FUB — the same account subject to the auto-debit authorization under the Loan Agreement — totaling $88,527.85. Each deposit matched the monthly payment amount displayed on the loan portal. Three of these deposits were made on January 3, 2025. (Doc 83 ¶4.)

14. After making the January 3, 2025 payments, Mr. Reddy attempted to meet with FUB to discuss the status of the loan. Mr. Reddy spoke briefly with Don Rudy, Vice President of FUB, who stated that the bank was not willing to discuss further.

15. On January 21, 2025, FUB's automated system debited $17,705.57 from Plaza 106's business checking account ("Transaction 1"). The debit was not initiated by Mr. Reddy. FUB did not apply the funds to the loan account. On or about February 5, 2025, FUB reversed the transaction through a "Payment Refund" entry — fifteen days after the original debit. (Doc 83 ¶6.)

16. Mr. Reddy was not aware of Transaction 1 at the time it occurred or when it was reversed. He discovered the transaction and its reversal in mid-February 2025 while reviewing account records.

17. Around February 11, 2025, Mr. Reddy received a text message from the Suite B tenant, Shreyas Makam, showing a picture of the Notice of Trustee's Sale (NOS1) posted on the tenant's door at the Property. Suite B stopped paying rent from that time onwards. Suite C tenant, Eddee Johansen, also stopped paying rent consistently, later sending an email to Mr. Reddy attributing the delay to the Notice of Trustee's Sale. Both working HVAC machines at the Property also stopped working in the coming months.

4

18. Mr. Reddy and Plaza 106 began exploring Chapter 11 as a protective measure. During this process, Mr. Reddy noticed transaction irregularities on the business checking account — specifically, Transaction 1.

19. On February 19, 2025, Mr. Reddy called Defendant Michael Brown at Parsons Behle & Latimer and requested a meeting. Mr. Reddy was not aware the bank would also attend.

20. On February 20, 2025, FUB's automated system debited $17,705.57 from Plaza 106's business checking account (Transaction 2). The debit was not initiated by Mr. Reddy.

21. On the same day, Mr. Reddy met with Brown, Don Rudy, and Dillon George at Parsons Behle & Latimer's office. The meeting lasted approximately three hours. Both Transaction 1 and Transaction 2 were discussed. (Doc 83 ¶8.)

22. During the meeting, Brown acknowledged that the foreclosure was irregular in light of the bank's acceptance of the February 20 payment after the Notice of Trustee's Sale had been filed, and indicated that he would cancel the foreclosure. Brown also asked Mr. Rudy about the January 21, 2025 transaction. Mr. Rudy responded to the effect of "I don't know" or "I don't remember." Mr. Rudy later testified under oath at the evidentiary hearing that he was "intimately" familiar with the loan account. During the meeting, Mr. Rudy also stated words to the effect of: "if the notices were defective, the bank could cancel them and reissue them tomorrow." Mr. George was more reconciliatory and suggested that Mr. Reddy obtain a quick takeout loan before the bank took action to pursue foreclosure once again. (Doc 83 ¶8.)

23. On or about February 24 or 25, 2025, Mr. Reddy called Brown and insisted the bank apply the deducted funds to the loan. Brown became upset. Mr. Reddy stated that the funds had already been deducted from the business bank account and that the memo line on the online portal stated the deduction was for payment for loan 4200. Mr. Reddy insisted that the deducted

amount should be applied to the loan as the memo line stated. He further questioned Brown by asking if the funds are not applied to the loan, does the bank even have any right to deduct from a depositor's account? Doesn't this amount to conversion? Brown stated he would get back to Mr. Reddy. (Doc 83 ¶9.)

24. From that point onwards, Mr. Reddy checked the online banking portal daily to see whether the deducted funds were being applied to the loan. On February 28, 2025, Mr. Reddy discovered his access to FUB's online banking portal had been disabled. Mr. Reddy called Brown. Brown did not inquire why Mr. Reddy had lost portal access — because, upon information and belief, he already knew. Brown stated words to the effect of: "the bank had taken too long to correct Transaction 1, and they were now working on Transaction 2." Mr. Reddy understood this to mean that the bank would be applying the funds to the loan. (Doc 83 ¶10.)

25. On or about March 3, 2025, portal access was restored to Mr. Reddy. By the time Mr. Reddy logged into the account, Transaction 2 had not been applied to the loan or returned to the checking account as Transaction 1 had been. It had been completely erased from the record. There was no reversal entry. There was no refund memo. There was no trace of the transaction. (Doc 83 ¶11.)

26. Mr. Reddy called Brown shortly after regaining portal access and raised the issue of the erased Transaction 2. Brown was dismissive, stating words to the effect of: "how much have you lost for eight days — maybe ten dollars worth of interest." Mr. Reddy told Brown that tenants had stopped paying rent as a result of the Notice of Trustee's Sale posted on tenant doors. Brown responded with words to the effect of: "can you prove causation?" (Doc 83 ¶11.)

6

27. Shortly thereafter, Mr. Reddy retained attorney Nathan Eaton. Mr. Eaton sent a settlement communication to Brown on behalf of Plaza 106 that specifically referenced both Transaction 1 and Transaction 2. (Doc 83 ¶12.)

28. FUB sent a Notice of Intent to File Notice of Default on March 11, 2025. FUB initiated a second Notice of Default and Election to Sell (NOD2) on April 17, 2025, and a second Notice of Trustee's Sale (NOS2) for September 16, 2025. (Doc 9 ¶¶9-11; Doc 43/44 ¶¶9-11.)

29. The tenant payment disruptions caused by the posting of NOS1 made it difficult for Plaza 106 to pursue any meaningful refinancing efforts. Following Mr. George's suggestion at the February 20 meeting, Mr. Reddy explored private lending options. However, even a higher interest private lender would need operating leases in place. While Mr. Reddy could have evicted and replaced Suite B and Suite C tenants in 3 months, that would give no time for a private lender to close on a short term loan. The NOS trapped Plaza 106 between non-paying tenants and the need to show active leases for refinancing. Plaza 106 filed for Chapter 11 bankruptcy on September 15, 2025. (Doc 43/44 ¶11.)

30. In its Motion for Relief from Stay (Doc 9 ¶17), FUB represented to this Court that "the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale." In Doc 9 ¶18, FUB represented that "Discussions between the Debtor and Movant broke down and the Debtor remained in default."

31. At the evidentiary hearing on February 5, 2026, FUB's own witness Mr. Rudy testified under oath that the cancellation was caused by "a payment that was taken ... it was done in mistake by the bank and reversed and put back and ... that's what caused the foreclosure to be restarted." (Transcript, p. 85; Doc 83, Ex. 2.)

7

32. At the same hearing, Mr. Rudy denied knowledge of Transaction 2 four times under oath, despite having discussed it at the February 20, 2025 meeting for approximately three hours. (Doc 83 ¶14.)

33. Monthly statements for the loan account that had previously been available on the portal were removed or restricted during February 2026, during the period of the evidentiary hearing. The past due amounts on three separate dates are exact multiples of $17,705.57, but as of February 4, 2026, the loan shows 16 payments past due instead of 18 — a shortfall of exactly $35,411.14, two payments. (Doc 83 ¶13.)

34. FUB filed its Motion for Relief from Stay (Doc 9) on October 16, 2025. Following an evidentiary hearing on February 5, 2026, and a ruling on March 2, 2026, this Court granted the Motion (Doc 54). Brown then signed a Notice of Trustee's Sale (NOS3) on March 17, 2026, scheduling the sale of the Property for April 21, 2026.

**COUNT 1**
**Strict Liability Under UCC Midnight Deadline**
**(Utah Code § 70A-4-302, § 70A-4-215)**
Against Defendant First Utah Bank

35. Plaintiff incorporates ¶¶1-34 by reference.

36. FUB is a payor bank as defined under Utah Code § 70A-4-105.

37. FUB's automated system debited $17,705.57 from the Debtor's checking account on January 21, 2025 (Transaction 1) and again on February 20, 2025 (Transaction 2).

38. Under § 70A-4-302, a payor bank that retains a demand item past its midnight deadline is accountable for the amount of the item, "whether properly payable or not."

39. Transaction 1 became final under § 70A-4-215 at midnight on January 22, 2025. FUB did not return or reverse the item until February 5, 2025 — fifteen days past the midnight deadline.

40. Transaction 2 became final under § 70A-4-215 at midnight on February 21, 2025. FUB did not return the item — it deleted it entirely.

41. Under § 70A-4-302, FUB is strictly liable for the face amount of both transactions — $35,411.14. The statute imposes liability on a payor bank that retains an item past the midnight deadline, "whether properly payable or not." No proof of actual damage is required.

42. Non-judicial foreclosure is not conducted under the supervision of a court of law; accordingly, strict compliance with the statute is required. Utah Code §§ 57-1-10 through 57-1-36. A Notice of Default stating a default amount that does not credit a legally finalized payment is defective.

43. The Notice of Sale signed by Brown on March 17, 2026 flows from the defective Notice of Default. The stated default amount is overstated by at least $35,411.14 — two finalized payments that were never credited to the loan.

## COUNT 2
### Bad Faith
### (Utah Code § 70A-4-103)
Against Defendant First Utah Bank

44. Plaintiff incorporates ¶¶1-43 by reference.

45. Under § 70A-4-103, a bank cannot disclaim responsibility for its lack of good faith or failure to exercise ordinary care.

46. FUB acted in bad faith across both transactions. As to Transaction 1: FUB's automated system debited $17,705.57 on January 21, 2025. Under the midnight deadline, that payment was final by January 22. FUB reversed it fifteen days later. Even under normal conditions, reversing a finalized transaction fourteen days past the deadline is irregular and contrary to ordinary care. But FUB was not operating under normal conditions — it was actively advancing a foreclosure against the Debtor. FUB had a heightened responsibility to account

9

accurately for payments received while pursuing a non-judicial sale of the Debtor's property. Despite that, the bank unilaterally reversed a payment that had been final for fourteen days. NOS1 — posted on tenant doors in February 2025 — was already defective before Transaction 2 even occurred.

47. As to Transaction 2: FUB debited the same amount on February 20, 2025. By February 21, the payment was final. Eight days later, FUB blocked the Debtor's portal access and deleted the transaction without a trace — no reversal entry, no refund memo, no record. The deletion of a second finalized transaction, while concealing the act from the customer, is not an isolated error. It confirms the intent of the bank and its bad faith across both transactions.

48. Under § 70A-4-103(e), if there is bad faith, damages include "any other damages the party suffered as a proximate consequence." The consequential damages flowing from this conduct include: defective Notice of Default, defective Notice of Sale, tenant disruption leading to inability to refinance, and the Debtor's Chapter 11 filing itself.

### COUNT 3
### Spoliation of Evidence
Against Defendant First Utah Bank

49. Plaintiff incorporates ¶¶1-48 by reference.

50. FUB had a duty to preserve Transaction 2 as a finalized financial record. Under § 70A-4-406, banks must retain the capacity to furnish legible copies for seven years.

51. FUB destroyed Transaction 2 by deleting it from the customer-facing portal while blocking the Debtor's access to the account. There was no reversal entry, no refund memo, no trace.

52. The deletion was intentional, not inadvertent. FUB blocked portal access on February 28, 2025, deleted the record, and restored access on March 3, 2025.

10

53. Plaintiff is entitled to an adverse inference that the destroyed record would have been unfavorable to FUB.

## COUNT 4
### Breach of Deposit Agreement
Against Defendant First Utah Bank

54. Plaintiff incorporates ¶¶1-53 by reference.

55. FUB and Plaza 106 entered into a written deposit agreement governing the checking account.

56. FUB breached the deposit agreement by reversing Transaction 1 without authorization, deleting Transaction 2 without any accounting entry, and blocking the Debtor's access to the online banking portal during the period of alteration.

57. Plaza 106 suffered damages as a direct and proximate result of these breaches, including irregular foreclosure, damaged tenant relationships, inability to refinance, and finally seeking bankruptcy protection which itself was deprived.

## COUNT 5
### Breach of Trustee's Duty of Good Faith
Against Defendant Michael R. Brown

58. Plaintiff incorporates ¶¶1-57 by reference.

59. As successor foreclosure trustee, Brown owed a duty of good faith to both the beneficiary and the trustor.

60. From February 28, 2025 onwards, Brown's conduct was that of a party conspiring with the bank rather than a neutral foreclosure trustee. His dismissal of the Debtor's concerns about the deleted transaction, his interactions with attorney Nathan Eaton on behalf of FUB, his execution of the second Notice of Default and Notices of Trustee's Sale, his participation in the

Motion for Relief from Stay, and his silence at the evidentiary hearing are all inconsistent with the good faith obligations of a foreclosure trustee.

61. Brown signed the second Notice of Default (NOD2) on April 17, 2025, the second Notice of Trustee's Sale (NOS2) for September 16, 2025, and a third Notice of Trustee's Sale (NOS3) on March 17, 2026, scheduling the sale of the Property for April 21, 2026. At the time Brown signed each of these Notices, he knew that Transaction 1 had been improperly reversed and Transaction 2 had been deleted. He knew the default amounts did not credit two finalized payments totaling $35,411.14.

62. Brown also stood silently at the evidentiary hearing while Mr. Rudy denied knowledge of Transaction 2 under oath — facts Brown knew to be false from personal involvement. A trustee who allows false testimony about the amounts owed on the very debt he is foreclosing is not a neutral fiduciary — he is a participant in the scheme.

63. Brown's conduct throughout was anything but neutral. A trustee who proceeds with a foreclosure based on amounts he knows are wrong breaches his duty of good faith to the trustor.

## COUNT 6
### Tortious Interference with Economic Relations
Against Defendant First Utah Bank

64. Plaintiff incorporates ¶¶1-63 by reference.

65. Plaza 106 had existing economic relationships with its tenants at the Property, including Suite B and Suite C.

66. FUB posted NOS1 on the tenant doors at the Property. Both Tenant B and Suite C directly attributed their non-payment to the posted notice.

67. FUB's conduct was intentional and improper. The posting was based on a foreclosure process built on a defective NOD flowing from UCC violations established in Counts 1 and 2.

12

68. As a direct and proximate result of FUB's conduct, Plaza 106 lost rental income, was unable to replace tenants due to the pending foreclosure, and was unable to refinance the Property.

### COUNT 7
### Violation of Statutory Duty / Conspiracy to Defraud Trustor
### (Utah Code § 57-1-25(5))
Against Defendants First Utah Bank and Michael R. Brown

69. Plaintiff incorporates ¶¶1-68 by reference.

70. Under § 57-1-25(5), a person who "assists in, conspires to commit, or solicits the commission of any act to defraud or deceive, or which would operate to defraud or deceive, a trustor" is liable to the trustor.

71. Brown, as successor foreclosure trustee, participated in and had knowledge of the bank's alteration of Transaction 1 and deletion of Transaction 2. Brown attended the February 20, 2025 meeting, communicated with the bank throughout the period of deletion, knew the bank's plan of action, dismissed the Debtor's concerns, and proceeded to sign NOS3 based on records he knew were inaccurate.

72. FUB altered, deleted, and concealed financial records relating to the loan secured by the Deed of Trust on the Property, inflating the default amount and enabling the foreclosure.

73. Brown and FUB acted in concert to defraud the trustor and are jointly and severally liable.

### COUNT 8
### Fraud on the Court
### (Fed. R. Civ. P. 60(d)(3) via Bankr. R. 9024)
Against Defendants First Utah Bank and Michael R. Brown

74. Plaintiff incorporates ¶¶1-73 by reference.

**The Standard**

13

75. The Supreme Court has held that where officers of the court participate in the fabrication or presentation of fraudulent materials to a court, the resulting judgment may be vacated for fraud on the court. The doctrine exists to protect the integrity of the judicial process itself.

76. The Tenth Circuit has defined fraud on the court as "fraud which is directed to the judicial machinery itself" — "where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function — thus where the impartial functions of the court have been directly corrupted."

77. External fraud — fraud that prevents a party from presenting his case to the court — is a recognized basis for vacatur.

### Officers of the Court

78. Brian M. Rothschild (USB #15316) is a member of the Utah State Bar and an officer of this Court. He signed and filed the Motion for Relief from Stay (Doc 9) on behalf of FUB.

79. Michael R. Brown (USB #16007) is a member of the Utah State Bar and an officer of this Court. He served as successor foreclosure trustee and as counsel for FUB throughout the events described herein.

### The Misrepresentation to This Court

80. In Doc 9 ¶17, Mr. Rothschild represented to this Court that "the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale." In Doc 9 ¶18, Mr. Rothschild represented that "Discussions between the Debtor and Movant broke down and the Debtor remained in default."

81. These representations were false, or at best, contained material omissions. FUB's own witness, Don Rudy, Vice President of the Bank, testified under oath at the evidentiary hearing on

14

February 5, 2026 that the cancellation was caused by "a payment that was taken ... it was done in mistake by the bank and reversed and put back and ... that's what caused the foreclosure to be restarted."

82. The cancellation was not caused by "discussions." It was caused by a bank-initiated transaction that the bank then reversed. Mr. Rothschild's representation in Doc 9 concealed the existence and significance of both transactions from this Court.

### Brown's Knowing Participation

83. Brown is not a bystander. Brown attended the February 20, 2025 meeting at Parsons Behle & Latimer where both Transaction 1 and 2 were discussed for approximately three hours. Brown acknowledged the foreclosure was irregular. Brown communicated, upon information and belief, with the bank during the period of deletion. Brown told the Debtor on February 28, 2025 that "the bank is working on it" while the Debtor's portal access was blocked and Transaction 2 was being erased. Brown dismissed the Debtor's concerns about the deleted transaction as "maybe ten dollars worth of interest."

84. Brown then stood silently while Rothschild filed Doc 9 representing to this Court that the cancellation was due to "discussions" — a representation Brown knew to be false based on his personal involvement in the events.

85. Brown stood silently while Rudy denied knowledge of Transaction 2 four times under oath at the evidentiary hearing — despite Brown having personally discussed Transaction 2 with the Debtor on multiple occasions and having been present at the February 20, 2025 meeting where Rudy himself participated in a three-hour discussion of both transactions.

86. This is not nondisclosure by a party or witness, which alone would not constitute fraud on the court. This is an attorney — an officer of this Court — who had personal knowledge

15

of the truth, who participated in the concealment of records from the Debtor, and who then allowed false representations and false testimony to be presented to this Court without correction. Since attorneys are officers of the court, their conduct, if dishonest, constitutes fraud on the court.

### External Fraud

87. Brown's conduct constituted external fraud as distinguished from internal fraud. External fraud is fraud that prevents a party from presenting his case to the court. Brown blocked the Debtor's access to the very records that would have revealed the bank's scheme. Brown told the Debtor "the bank is working on it" while those records were being deleted. Brown dismissed the Debtor's concerns as trivial. By the time the Debtor regained access to his account and discovered the full scope of the alteration, the records had been erased.

### The Court's Reliance

88. This Court relied on the representations in Doc 9 and on the testimony at the evidentiary hearing in granting the Order for Relief from Stay (Doc 54). The Court's impartial function was directly affected. The Court was not presented with the facts it was entitled to have — that the cancellation was caused by a bank-initiated transaction, not by "discussions," and that a second transaction had been deleted from the records entirely.

89. The loan account independently corroborates the scheme. As of February 4, 2026, the loan shows 16 payments past due instead of 18 — a shortfall of exactly $35,411.14, two payments. If Transaction 1 was reversed to the checking account and Transaction 2 was deleted from the checking account, neither should have affected the loan account. Yet the loan account is short by exactly two payments. The only logical explanation is that records on the loan account were also altered.

16

**An Unconscionable Scheme**

90. This is not a single false statement. It is a coordinated sequence of acts by an officer of this Court in concert with FUB: alter Transaction 1 → post NOS1 on tenant doors → debit Transaction 2 → block portal access → delete Transaction 2 → dismiss the Debtor's concerns → file Doc 9 representing "discussions" as the cause → allow Mr. Rudy to deny Transaction 2 under oath → obtain stay relief → sign NOS3 based on records Brown knew were wrong. At every stage, an officer of this Court participated.

91. Doc 54, Order Granting First Utah Bank's Motion for Relief from Stay, was procured by fraud on the court. Plaintiff requests that this Court vacate the Order under Fed. R. Civ. P. 60(d)(3) via Bankr. R. 9024.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment as follows:

A. Injunctive Relief. Issue a temporary restraining order and preliminary injunction enjoining Defendants from proceeding with the Trustee's Sale scheduled for April 21, 2026, or any subsequent sale of the Property.

B. Vacate Stay Relief Order. Vacate the Order Granting First Utah Bank's Motion for Relief from Stay (Doc 54) as procured by fraud on the court under Fed. R. Civ. P. 60(d)(3) via Bankr. R. 9024, thereby reimposing the automatic stay under 11 U.S.C. § 362(a) as to the Property.

C. Costs and Fees. Award Plaintiff costs of suit and attorneys' fees as permitted by law.

D. Declaratory Relief. Declare that Transaction 1 and Transaction 2 became final under § 70A-4-302 and § 70A-4-215, that the Notice of Sale signed by Brown on March 17, 2026 is

17

defective for failure to credit two finalized payments totaling $35,411.14, and that non-judicial foreclosure based on defective notices is void.

E. Spoliation Sanctions. Enter an adverse inference instruction against Defendants for the destruction of Transaction 2 records.

F. Damages. Award Plaintiff damages including the face amount of both transactions under § 70A-4-302, consequential damages under § 70A-4-103(e) for bad faith, damages for breach of the deposit agreement, and damages for tortious interference with economic relations.

G. Punitive Damages. Award punitive damages against Defendants in an amount sufficient to deter the conduct described herein.

H. Other Relief. Grant such other and further relief as this Court deems just and proper.


Dated  April 17, 2026 **VALERGA LLP**

/s/Brody Valerga
Brody Valerga
*Attorney for Plaintiff and Debtor in Possession*

18

## VERIFICATION

I, Nagendra Prasad Reddy, Managing Member of Plaza 106, LLC, declare under penalty of perjury under the laws of Utah and the United States of America that I have read the foregoing Complaint, that the factual allegations therein are true and correct to the best of my knowledge, information, and belief.

Executed on 17th April , 2026, at Millcreek, Utah.

_____

Nagendra Prasad Reddy
Managing Member, Plaza 106, LLC