Brody Valerga (11789)
**Valerga LLP**
395 S. Main Street #201
Alpine, UT 84004
(801) 893-3635
brody@valergalawyers.com
*Proposed Special Counsel for the Debtor in Possession*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In Re:<br>**PLAZA 106, LLC,**<br>Debtor in Possession. | Bankruptcy No. 25-bk-25459-PH<br><br>Chapter 11<br>Hon. Peggy Hunt |
| **PLAZA 106, LLC,**<br><br>    Plaintiff,<br><br>v.<br><br>**FIRST UTAH BANK, a Utah state-chartered bank; and MICHAEL R. BROWN, in his capacity as Successor Foreclosure Trustee,**<br><br>Defendants. | Adversary Proceeding No. 26-02063 |

**DEBTOR'S AMENDED EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION WITH CERTIFICATE OF SERVICE**

Plaza 106, LLC (the "Debtor"), by and through counsel, moves this Court for (1) a
temporary restraining order under Rule 65(b) (via Bankr. R. 7065), to be entered ex parte for
fourteen days; and (2) a preliminary injunction under Rule 65(a), pending resolution of this
adversary proceeding filed concurrently herewith. Separate proposed orders are attached.

**INTRODUCTION**

The stay relief order (Dkt. No. 54) was obtained through what is believed to be an orchestrated fraud on this Court by officers of the court acting in coordination with First Utah Bank ("FUB"). FUB's counsel, Brian M. Rothschild, represented in a signed pleading that the cancellation of the initial foreclosure occurred because "the Debtor began discussions with the Movant." (Dkt. No. 9, ¶17.) That representation was directed at the Court itself, and was made for the purpose of obtaining a court order, and the Court relied on it. FUB's own witness, Don Rudy, Vice President of the Bank, testified as to the true reason, stating that the cancellation resulted from "a bank error" — a bank-initiated auto-debit that FUB reversed. (Transcript, pp. 85–87.)

The "bank error" is not an isolated incident but rather one in a pattern of errors and attempted coverups by FUB designed to conceal its missteps in pursuing foreclosure on the subject property. To prevent irreparable harm, this Court should issue a temporary restraining order and preliminary injunction enjoining the sale of the property pending the adversary proceeding, which will bring FUB's errors—and its apparent efforts to conceal them—to light. A Trustee's Sale of the Property at 894 East 3900 South, Salt Lake City, Utah 84107 is scheduled for **April 21, 2026** — four days away. The Debtor requests the Court sign the attached TRO immediately and schedule a preliminary injunction hearing within fourteen days.

The financial records obtained through discovery in the adversary proceeding will establish three key facts: (1) FUB reversed one payment (Transaction 1) in violation of the UCC's midnight deadline; (2) FUB deleted a second payment entirely while simultaneously blocking the Debtor's access to the online portal; and (3) the loan account remained short by exactly $35,411.14— reflecting the two payments that left the Debtor's account but were never applied to the loan.

These facts give rise to joint liability on multiple grounds. Under Utah Code § 70A-4-103, a bank and any person acting on its behalf share combined liability for bad faith conduct. Under

Utah Code § 57-1-25(5), Michael Brown ("Brown"), as successor trustee, owed a statutory duty not to conspire to defraud the trustor. And under *Jedrziewski v. Smith*, 2005 UT 85, 128 P.3d 1146, conspirators are jointly and severally liable for all resulting damages.

## FACTUAL BACKGROUND

1.      On July 20, 2022, Plaza 106 LLC entered into a Business Loan Agreement with First Utah Bank in the amount of $2,750,000. (Dkt. No. 9, Ex. A.)

2.      Plaza 106 executed a Promissory Note with a fixed monthly payment of $17,705.57 for 119 payments. (Dkt. No. 9, Ex. B.)

3.      Plaza 106 faced challenges with tenant payments and other issues affecting cash flow. The last regular loan payment was made in July of 2024.

4.      Unbeknownst to Plaza 106, FUB sent a Notice of Default and Acceleration on September 25, 2024 (Dkt. No. 9, Ex. G) and recorded a Notice of Default and Election to Sell on November 1, 2024 (NOD1) (Dkt. No. 9, Ex. I). Plaza 106 did not become aware of these filings until after January 3, 2025, when Prasad Reddy, owner and manager of Plaza 106, contacted the bank following catch-up payments made by Plaza 106.

5.      Despite the cashflow challenges, Plaza 106 was focused on catching up on payments. Between October 2024 and January 2025, Mr. Reddy made five separate deposits of $17,705.57 each into Plaza 106's business checking account at FUB — the same account subject to the auto-debit authorization under the Loan Agreement — totaling $88,527.85. Each deposit matched the monthly payment amount displayed on the loan portal. Three of these deposits were made on January 3, 2025. (Dkt. No. 83 ¶4.)

6.      After making the January 3 payments, Mr. Reddy attempted to meet with FUB to discuss the status of the loan. Mr. Reddy spoke briefly with Don Rudy, Vice President of FUB, who stated that the bank was not willing to discuss the account further.

7.      FUB auto-debited $17,705.57 from the Debtor's checking account on January 21, 2025 ("Transaction 1"). Under Utah Code § 70A-4-302, the transaction became final at midnight on January 22, 2025.

8.      Once the midnight deadline passed, the payment should have legally been applied. The loan balance should have been reduced by $17,705.57 as a matter of law. FUB's reversal on February 5, 2025 — fifteen days later — was unauthorized under § 70A-4-215.

9.      The unauthorized reversal inflated the loan balance and enabled the foreclosure in bad faith.

10.      In February 2025, Mr. Reddy received a text message from the Suite B tenant showing a picture of the Notice of Trustee's Sale (NOS1) posted on the tenant's door at the Property.

11.      Mr. Reddy and Plaza 106 began exploring Chapter 11 as a protective measure. During this process, Mr. Reddy noticed transaction irregularities on the business checking account — specifically, Transaction 1.

12.      On February 19, 2025, Mr. Reddy called Brown at Parsons Behle & Latimer and requested a meeting. Mr. Reddy was not aware that FUB would also attend.

13.      On February 20, 2025, Mr. Reddy met with Brown, Don Rudy, and Dillon George at Parsons Behle & Latimer's office. The meeting lasted approximately three hours. On the same day, FUB auto-debited $17,705.57 from Plaza 106's business checking account (Transaction 2).

14.     During the meeting, both Transaction 1 and Transaction 2 were discussed. (Dkt. No. 83 ¶8.)

15.     During the meeting, Brown acknowledged that the foreclosure was irregular in light of the bank's acceptance of the February 20 payment after the Notice of Trustee's Sale had been filed, and indicated that he would cancel the foreclosure. Mr. Rudy stated words to the effect of: "if the notices were defective, the bank could cancel them and reissue them tomorrow." Mr. George was more reconciliatory and suggested that Mr. Reddy obtain a quick takeout loan before new notices or action was taken by the bank to pursue foreclosure once again. (Dkt. No. 83 ¶8.)

16.     On or about February 24 or 25, 2025, Mr. Reddy called Brown and insisted the bank apply the deducted funds to the loan. Brown became upset. Mr. Reddy asked whether withholding funds without applying them to the loan would amount to conversion. Brown stated he would get back to Mr. Reddy. (Dkt. No. 83 ¶9.)

17.     On February 28, 2025, Mr. Reddy discovered his access to FUB's online banking portal had been disabled. Mr. Reddy called Brown. Brown did not inquire why Mr. Reddy had lost portal access — because, upon information and belief, he already knew. Brown stated the bank had taken too long on Transaction 1 and they were now working on Transaction 2. (Dkt. No. 83 ¶10.)

18.     On or about March 3, 2025, portal access was restored to Mr. Reddy. By the time Mr. Reddy logged into the account, Transaction 2 had been completely erased from the record. There was no reversal entry. There was no refund memo. There was no trace. (Dkt. No. 83 ¶11.)

19.     Mr. Reddy called Brown shortly after regaining portal access and raised the issue of the erased Transaction 2. Brown was dismissive, stating words to the effect of: "how much

have you lost for eight days — maybe ten dollars worth of interest." Mr. Reddy told Brown that tenants had stopped paying rent as a result of the Notice of Trustee's Sale posted on tenant doors. Brown responded with words to the effect of: "can you prove causation?" (Dkt. No. 83 ¶11.)

20.     Shortly thereafter, Mr. Reddy retained attorney Nathan Eaton. Mr. Eaton sent a settlement communication to Brown on behalf of Plaza 106 that specifically referenced both Transaction 1 and Transaction 2. (Dkt. No. 83 ¶12.)

21.     FUB sent a Notice of Intent to File Notice of Default on March 11, 2025. FUB initiated a second Notice of Default and Election to Sell (NOD2) on April 17, 2025, and a second Notice of Trustee's Sale (NOS2) for September 16, 2025. (Dkt. No. 9 ¶¶9-11; Dkt. No. 43/44 ¶¶9-11.)

22.     Plaza 106 filed for Chapter 11 bankruptcy on September 15, 2025. (Dkt. No. 43/44 ¶11.)

23.     In its Motion for Relief from Stay (Dkt. No. 9 ¶17), FUB represented to this Court that "the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale." In Dkt. No. 9 ¶18, FUB represented that "Discussions between the Debtor and Movant broke down and the Debtor remained in default."

24.     At the evidentiary hearing on February 5, 2026, FUB's own witness, Mr. Rudy, testified under oath that the cancellation was caused by "a payment that was taken ... it was done in mistake by the bank and reversed and put back and ... that's what caused the foreclosure to be restarted." (Transcript, p. 85; Dkt. No. 83, Ex. 2.)

25.     At the same hearing, Mr. Rudy denied knowledge of Transaction 2 four times under oath, despite having discussed it at the February 20, 2025 meeting for approximately three hours. (Dkt. No. 83 ¶14.)

26.     Monthly statements for the loan account that had previously been available on the portal were removed during February 2026, during the period of the evidentiary hearing. The past due amounts on three separate dates are exact multiples of $17,705.57, but as of February 4, 2026, the loan shows 16 payments past due instead of 18 — a shortfall of exactly $35,411.14, or two payments. (Dkt. No. 83 ¶13.)

27.     After this Court granted FUB's Motion for Relief from Stay (Dkt. No. 54), Brown signed a Notice of Trustee's Sale (NOS3) on March 17, 2026, scheduling the sale of the Property for April 21, 2026.

**A.     False Narrative Directed at the Court**

In its stay relief motion, FUB's counsel Brian M. Rothschild represented:

¶17. ...the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale.

¶18. Discussions between the Debtor and Movant broke down and the Debtor remained in default.

(Dkt. No. 9, ¶¶ 17–18.)

At best, Mr. Rothschild failed to state the true reason for the cancellation of the foreclosure—Transaction 1, and at worst, this was an intentional misrepresentation to the Court leaving out important facts to create a false narrative. This Court relied on the false narrative — that the Debtor was given an opportunity and squandered it — in evaluating whether cause existed under § 362(d)(1).

**B.     FUB's Own Witness Confirmed the True Reason for Cancellation**

At the February 5, 2026 evidentiary hearing, FUB's witness Don Rudy testified:

"There was a payment that was taken, there was a transfer that was taken, that's —
and it was done in mistake by the bank and reversed and put back and the — that's
what caused the foreclosure to be restarted."

(Transcript, p. 87; Dkt. No. 83, ¶ 2, Exhibit 2.) He further stated: "It was an auto — an auto
payment that the bank had not turned off the auto payment system by mistake. It was a bank error."
(Transcript, pp. 85–86.) These accounts are irreconcilable. Mr. Rothschild's pleading attributed the
cancellation to the Debtor's initiative. FUB's own officer attributed it to the Bank's automated
system error. The court seemingly relied on the false narrative of Mr. Rothschild in its ruling.

**Brown's direct knowledge.** On February 20, 2025, Brown participated in a three-hour
meeting at Parsons Behle & Latimer with the Debtor (represented by Prasad Reddy), Don Rudy,
and Dillon George (Vice President of FUB). Both Transaction 1 and Transaction 2 were discussed
in detail. Brown acknowledged that the foreclosure was irregular in light of the Bank's acceptance
of the February 20 payment after the Notice of Trustee Sale had been filed, and indicated he would
cancel the foreclosure. (Dkt. No. 83, ¶ 8.)

**Brown's dismissal of the irregularities.** When Mr. Reddy called Brown on or about
February 24 or 25 to ask why Transaction 2 had not been applied to the loan, Brown became upset.
When the Mr. Reddy called again on February 28 after discovering his portal access to his FUB
account was disabled, Brown stated FUB had "taken too long on Transaction 1" and was "working
on Transaction 2."

When Mr. Reddy's access to the account was restored and Transaction 2 had been deleted,
Brown dismissed the Debtor's concerns, essentially stating: "how much have you lost for eight
days — maybe ten dollars worth of interest." When the Debtor raised the impact on tenants, Brown
responded: "can you prove causation?" (Dkt. No. 83, ¶¶ 9–11.) These are not the responses of an

attorney who is unaware of irregularities. They are the responses of an attorney managing a situation.

**Brown's silence during false testimony.** At the evidentiary hearing, Rudy denied knowledge of Transaction 2 four times. (Dkt. No. 83, ¶ 14; Exhibits 11–12.) Brown was present. He had personally discussed Transaction 2 with Rudy for three hours. Under the Utah Supreme Court Rules of Professional Practice Rule 3-3.3(b), an attorney who knows a witness has offered materially false testimony in a proceeding before a tribunal must take reasonable remedial measures, including disclosure to the tribunal if necessary. Brown took no remedial action. His silence permitted the false testimony to stand uncorrected before this Court.

**Nathan Eaton's communication.** The Debtor subsequently retained attorney Nathan Eaton, who sent a settlement communication to Brown specifically referencing both Transaction 1 and Transaction 2. (Dkt. No. 83, ¶ 12; Exhibit 5.) Brown therefore received written notice of the transaction irregularities from the Debtor's counsel — and neither Brown nor Rothschild corrected the false representation in Docket No. 9 or disclosed the irregularities to this Court.

## C.    The UCC Violations and Spoliation

Transaction 1 and 2 also constitute independent violations of the Uniform Commercial Code, for which the Bank and its agents bear combined liability under Utah Code § 70A-4-103.

**Transaction 1 — UCC Strict Liability.** On January 21, 2025, FUB's system auto-debited $17,705.57 from the Debtor's checking account. Both accounts are at FUB, making this an internal transfer. Under Utah Code § 70A-4-302, a payor bank that retains an item beyond the midnight deadline becomes strictly liable for the amount. FUB held the funds for approximately fifteen days before reversing them through a manual "Payment Refund" — an affirmative human act, not an automated correction. (Dkt. No. 83, ¶ 6; Exhibit 4.) This is the transaction Rudy described as the

"bank error" that "caused the foreclosure to be restarted" — the very transaction Rothschild attributed to the Debtor's "discussions."

**Transaction 2 — Bad Faith and Spoliation.** On February 20, 2025, FUB's system auto-debited another $17,705.57. The transaction finalized the next day. On February 28, the Debtor's portal access was disabled. When access was restored on or about March 3, the transaction had been deleted entirely — no reversal, no refund, no trace. (Dkt. No. 83, ¶¶ 7, 10–11.) Under § 70A-4-103(e), a bank acting in bad faith cannot disclaim liability by agreement, and bad faith unlocks all consequential damages suffered as a proximate consequence. The deletion of a finalized bank transaction is not a processing error — it is the destruction of a financial record. The temporal sequence — portal blocked, transaction deleted, access restored — demonstrates consciousness of the act and establishes bad faith as a matter of law.

### D.     Brown's Conspiracy with FUB — § 57-1-25(5)

Brown serves simultaneously as FUB's litigation counsel and as successor foreclosure trustee under the Deed of Trust. On March 17, 2026, in his capacity as trustee, Brown signed the Notice of Trustee's Sale. Under Utah Code § 57-1-25(5), a trustee who exercises the power of sale has a statutory duty not to "conspire or scheme to defraud" the trustor. Brown's conduct satisfies the "conspire" prong of this statute: he participated in the three-hour meeting where both transactions were discussed, dismissed the Debtor's concerns about altered records, sat silently while Rudy denied Transaction 2 four times under oath, failed to correct Rothschild's lack of candor in Docket No. 9, and then signed the Notice of Trustee's Sale scheduling the auction of the Property — all while simultaneously serving as FUB's litigation counsel. This is not the conduct of a neutral trustee; it suggests, at minimum, that Brown has acted in concert with FUB. Under

*Jedrziewski v. Smith*, 2005 UT 85, 128 P.3d 1146, conspirators are jointly and severally liable for all damages. Brown and FUB share liability for the entirety of the conspiracy.

The pattern extends to the Debtor's tenants. On or about February 10, 2025, a Notice of Trustee Sale was posted on tenant doors at the Property — after Transaction 1 had been debited and before it was reversed. Suite B stopped paying rent; eviction proceedings followed. Suite C delayed rent. These are the same tenants whose nonpayment was cited by this Court as a basis for granting stay relief. FUB's own unauthorized transaction and premature notice posting caused the tenant disruption that FUB then used to argue for stay relief. This is tortious interference through improper means — and the improper means include the UCC violations, the spoliation, and the false representation to this Court.

**E.      The Loan Account Confirms the Discrepancy**

The loan account is short by exactly two payments (Dkt. No. 83, ¶ 13):

- February 20, 2025: $123,938.99 — seven payments.

- March 7, 2025: $141,644.56 — eight payments.

- February 4, 2026: $283,289.12 — sixteen payments (eighteen expected).

The shortfall is exactly $35,411.14 — two payments that left the checking account but never reached the loan. As of April 17, 2026, the discrepancy persists. The Debtor will demonstrate this through the adversary proceeding. The default amount underlying Docket No. 54 does not account for these payments.

**F.      The Scheduled Sale**

Brown signed a Notice of Trustee's Sale on March 17, 2026, scheduling the auction for April 21, 2026. No redemption right exists under Utah law. Utah Code § 57-1-28(3).

**E.      Evidentiary Standard and Discovery**

The evidence currently before this Court — the irreconcilable contradiction between Docket No. 9 and Mr. Rudy's testimony, the bank statements documenting both transactions, the screenshot of Transaction 2 Brown's direct participation in discussions of both transactions, Brown's silence during Mr. Rudy's false testimony, and the $35,411.14 loan account discrepancy — exceeds the preponderance standard required for emergency relief. The clear and convincing standard applicable to the Rule 60(d)(3) claim in the adversary proceeding will be met through discovery, including subpoena of transaction records from FUB's core banking processor, FIServ, which will independently confirm the existence, processing, and deletion of both transactions. FIServ records are maintained independently of FUB and cannot be altered by the Bank.

## LEGAL STANDARD

A TRO may issue ex parte under Rule 65(b) upon a showing of immediate irreparable injury and attorney certification of notice efforts. A preliminary injunction under Rule 65(a) requires notice and a showing of: (1) substantial likelihood of success; (2) irreparable harm; (3) favorable balance of equities; and (4) public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 (10th Cir. 2009).

## ARGUMENT

**A.     Substantial Likelihood of Success**

The 10th Circuit in *Bulloch v. United States*, 763 F.2d 1115 (10th Cir. 1985) (en banc), established five elements for fraud on the court under Rule 60(d)(3): (1) an intentional fraud; (2) by an officer of the court; (3) directed at the judicial machinery itself; (4) that in fact deceives the court; and (5) supported by clear, unequivocal, and convincing evidence. The evidence before this Court satisfies each element at a preponderance standard sufficient for emergency relief, and the Debtor will meet the clear and convincing standard through FIServ discovery.

**The fraud was intentional.** Mr. Rothschild filed a pleading attributing the NOD cancellation to the Debtor's initiative. Mr. Rudy's own testimony proves the cancellation resulted from a bank error. Brown had direct knowledge of the true facts from the February 20, 2025 meeting and from multiple phone calls with the Debtor, yet the false representation was never corrected.

**The fraud was committed by officers of the court.** Both Mr. Rothschild and Brown are admitted members of the Utah State Bar acting as counsel for FUB in this proceeding. Their conduct is not attributable to lay employees of the Bank — it is the conduct of attorneys who owe duties of candor to this tribunal under SCRP Rule 3-3.3.

**The fraud was directed at the judicial machinery itself.** The false representation in Docket No. 9 was not a private communication between the parties. It was made in a pleading filed for the express purpose of obtaining a court order. It was designed to be relied upon by this Court — and it was.

**The fraud in fact deceived the Court.** This Court granted stay relief based on the record before it, which included the false narrative that the Debtor had been given an opportunity to cure and failed. The tenant disruption caused by FUB's own premature notice posting was attributed to the Debtor's mismanagement rather than to FUB's misconduct.

Beyond fraud on the court, the evidence independently supports: (a) strict liability under § 70A-4-302 for Transaction 1 (fifteen days past midnight deadline); (b) bad faith and spoliation for Transaction 2 (deletion of a finalized transaction while portal access was blocked), triggering the § 70A-4-103 consequential damages escalator that imposes combined liability on the bank and any person acting on its behalf; (c) conspiracy to defraud the trustor under § 57-1-25(5), for which Brown and FUB are jointly and severally liable under *Jedrziewski v. Smith*, 2005 UT 85, 128 P.3d

1146 ; and (d) tortious interference with the Debtor's tenant relationships through improper means — the UCC violations, the false representation, and the premature notice posting that directly caused the tenant disruption FUB then used as grounds for stay relief.

Each of these independently supports the claims in the accompanying eight-count Complaint. Together, they establish an orchestrated attack on the judicial machinery by officers of the court acting in coordination with their client — not simply a series of bank errors.

**B.      Irreparable Harm**

The sale is four days away. Under Utah Code § 57-1-28(3), there is no redemption right. The Property is the estate's primary asset with tenants and rental income. Its loss collapses the reorganization and is beyond any judicial remedy. The Debtor has maintained the Property, made adequate protection payments, paid taxes, and segregated rents. (Dkt. No. 58, ¶¶ 6–8.) The Debtor seeks time for this Court to determine whether its order was obtained through fraud — not delay.

**C.      Balance of Equities**

FUB's lien survives regardless. Adequate protection payments continue. A temporary restraint costs FUB nothing it will not recover. Allowing the sale to proceed costs the Debtor everything — and permanently extinguishes this Court's ability to correct the fraud. FUB risks a brief delay with its security intact while the Debtor risks irreversible loss.

**D.      Public Interest**

Rule 60(d)(3) reflects the Supreme Court's determination that finality must yield when an order has been obtained through fraud on the court. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). This power belongs to the court itself — it has no time limit, cannot be waived, and exists because no court can permit its processes to serve as vehicles for fraud. Allowing an irreversible sale based on an order obtained through an orchestrated attack on the

judicial machinery by officers of the court would permanently extinguish that power. The public interest is served by preserving the Court's ability to determine whether its proceedings were subverted — and to set things right if they were.

## RELIEF REQUESTED

WHEREFORE, the Debtor requests that this Court:

1. Enter the attached Proposed Temporary Restraining Order for fourteen days;

2. Schedule a preliminary injunction hearing within the TRO period, on notice to all parties;

3. Following the hearing, enter the attached Proposed Order Granting Preliminary Injunction;

4. Waive the bond requirement or set a nominal amount; and

5. Grant such other relief as the Court deems just.

## CERTIFICATION UNDER RULE 65(B)

**Irreparable injury:** The Trustee's Sale is April 21, 2026. No redemption right exists. Utah Code § 57-1-28(3). The Debtor's primary asset will be irreversibly transferred before a hearing can be held on notice.

**Efforts to give notice:** Due to the imminent sale date and insufficient time to provide formal notice and allow a meaningful response, counsel did not attempt advance notice. The Debtor requests the Court enter the TRO ex parte and schedule a preliminary injunction hearing at the earliest practicable date, at which Respondent will have a full opportunity to be heard.

Dated  April 17, 2026                                   **VALERGA LLP**


                                                        /s/Brody Valerga
                                                        Brody Valerga

                                                        *Proposed Special Counsel for the Debtor in Possession*

### Certificate of Service

Service of the foregoing **Motion for Temporary Restraining Order** shall be served on the parties in the manner designated below:

By Electronic Service: The parties of record in this case, as identified below as registered CM/ECF users.
 Michael Ronald Brown mbrown@parsonsbehle.com
Andres' Diaz courtmail@adexpresslaw.com
John S. Gygi john.gygi@sba.gov
Timothy J. Larsen tlarsen@adexpresslaw.com
James C. Lewis jlewis@lewishansen.com, wendy@lewishansen.com
Mark C. Rose mrose@rqn.com, docket@rqn.com;asanchez@rqn.com
Brian M. Rothschild brothschild@parsonsbehle.com,
ecf@parsonsbehle.com;docket@parsonsbehle.com
United States Trustee USTPRegion19.SK.ECF@usdoj.gov
Melinda Willden tr melinda.willden@usdoj.gov,
Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj
.gov;Brittany.Dewitt@usdoj.gov

By U.S. Mail: In addition to the parties receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed.R.Civ.P.5(b).

Plaza 106, LLC
1800 Airport Road
Price, UT 84501