Zack L. Winzeler, USB #12280
Brian M. Rothschild, USB #15316
Whitney E. McKiddy, USB #17585
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
ZWinzeler@parsonsbehle.com
BRothschild@parsonsbehle.com
WMcKiddy@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Defendants, Counterclaim Plaintiff,
and Third-Party Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>PLAZA 106 LLC,<br><br>        Debtor. | Adv. No. 26-ap-02063-PH<br><br>(Related to Case No. 25-bk-25459-PH) |
| PLAZA 106 LLC,<br><br>        Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>FIRST UTAH BANK, a Utah State Chartered Bank; and MICHAEL R. BROWN, in his capacity as Successor Foreclosure Trustee,<br><br>        Defendants and Counterclaim Plaintiff | Chapter 11<br><br>Judge Peggy Hunt |
| FIRST UTAH BANK, a Utah State Chartered Bank,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>NAGENDRA PRASAD REDDY,<br><br>        Third-Party Defendant. | |

4903-0951-9785

## ANSWER TO VERIFIED COMPLAINT, FIRST UTAH BANK'S COUNTERCLAIM, AND THIRD-PARTY COMPLAINT AGAINST NAGENDRA PRASAD REDDY

Defendants First Utah Bank (the "**Bank**") and Michael R. Brown ("**Brown**" and, together with the Bank, "**Defendants**"), by and through counsel, hereby answer Plaintiff Plaza 106, LLC's Verified Complaint as follows:

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendants respond to the allegations of the Complaint as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a). This adversary proceeding is referred to this Court by the standing order of reference of the United States District Court for the District of Utah.

**ANSWER:** Admit.

2.      This is a core proceeding under 28 U.S.C. § 157(b)(2), including proceedings to determine the validity or extent of a lien (§ 157(b)(2)(K)), proceedings affecting the adjustment of the debtor-creditor relationship (§ 157(b)(2)(O)), and other proceedings affecting the administration of the estate (§ 157(b)(2)(A)).

**ANSWER:** Admit.

3.      This adversary proceeding is properly commenced under Federal Rule of Bankruptcy Procedure 7001, including: a proceeding to obtain injunctive relief (Rule 7001(7));

2

and a proceeding to determine the validity, priority, or extent of a lien or other interest in property (Rule 7001(2)).

**ANSWER:** Admit.

4.     Venue is proper in this District under 28 U.S.C. § 1409(a) because the above-captioned bankruptcy case is pending in this District.

**ANSWER:** Admit.

5.     This Court has authority to grant the relief requested under 11 U.S.C. § 105(a), Federal Rule of Civil Procedure 60(d)(3) (made applicable by Bankruptcy Rule 9024), and Federal Rule of Civil Procedure 65 (made applicable by Bankruptcy Rule 7065).

**ANSWER:** Admit.

**PARTIES**

6.     Plaintiff Plaza 106, LLC ("Plaintiff" or "Debtor") is a Utah limited liability company and the debtor in possession in the above-captioned Chapter 11 bankruptcy case. The Debtor owns the real property located at 894 East 3900 South, Salt Lake City, Utah 84107 (the "Property").

**ANSWER:** Answering the allegations of paragraph 6, Defendants admit Plaintiff is a Utah limited liability company and a debtor in the above-captioned Chapter 11 bankruptcy case. Defendants deny Plaintiff owns the Property as of the date of this Answer.

7.     Defendant First Utah Bank ("FUB") is a Utah state-chartered bank with its principal place of business in Salt Lake City, Utah. FUB is the beneficiary under a Deed of Trust recorded on July 20, 2022, encumbering the Property, and is a creditor in the above-captioned bankruptcy case.

3

4903-0951-9785

**ANSWER:** Answering the allegations of paragraph 7, Defendants admit the Bank is a Utah state-charted bank with its principal place of business in Salt Lake City, Utah. The Bank was the beneficiary under the referenced Deed of Trust but affirmatively assert that the Bank completed its foreclosure of the Deed of Trust through a trustee's sale conducted on April 21, 2026.

8.      Defendant Michael R. Brown (USB #16007) ("Brown") is the successor foreclosure trustee under the Deed of Trust encumbering the Property, having been substituted as trustee on October 31, 2024. Brown is also an attorney admitted to practice before this Court and a member of the law firm Parsons Behle & Latimer, and serves as litigation counsel for FUB in the above-captioned bankruptcy case. Brown's claims in this proceeding arise from his conduct in his capacity as trustee.

**ANSWER:** Defendants deny that Plaintiff has stated any plausible claim against Brown in his capacity as trustee. Defendants also deny that Brown served as litigation counsel for the Bank in the above-captioned bankruptcy case. Defendants admit the remaining allegations contained in paragraph 8 of the Complaint.

## GENERAL FACTUAL ALLEGATIONS

9.      On July 20, 2022, Plaza 106 LLC entered into a Business Loan Agreement with First Utah Bank in the amount of $2,750,000. (Doc 9-1.)

**ANSWER:** Answering paragraph 9 of the Complaint, Defendants admit that Plaza 106 LLC entered into the Business Loan Agreement, but further aver that the Business Loan Agreement speaks for itself and denies all allegations inconsistent therewith.

10.     Plaza 106 executed a Promissory Note with a fixed monthly payment of $17,705.57 for 119 payments. (Doc 9-2.)

4903-0951-9785

**ANSWER:** Answering paragraph 10 of the Complaint, Defendants admit that Plaza 106 LLC executed a Promissory Note, but further aver that the Promissory Note speaks for itself and deny all allegations inconsistent therewith.

11. Plaza 106 faced challenges with tenant payments and other issues affecting cash flow. The last regular loan payment was made in July of 2024.

**ANSWER:** Defendants admit that Plaza 106's last loan payment was made in July of 2024. Defendants deny the remaining allegations contained in paragraph 11 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

12. Unbeknownst to Plaza 106, FUB sent a Notice of Default and Acceleration on September 25, 2024 (Doc 9-7) and recorded a Notice of Default and Election to Sell on November 1, 2024 (NOD1) (Doc 9-9). Plaza 106 did not become aware of these filings until around the time of January 3, 2025, when Prasad Reddy, Managing Member of Plaza 106, contacted the bank following catch-up payments made by Plaza 106.

**ANSWER:** Answering paragraph 12 of the Complaint, Defendants aver that the September 2024 Notice of Acceleration, and November 2024 Notice of Default and Election to Sell speak for themselves and deny all allegations inconsistent therewith. Defendants also deny Plaintiff's allegation that these Notices were sent "[u]nbeknownst to Plaza 106" because the Notices were served on Plaintiff. Defendants admit that Prasad Reddy (**Mr. Reddy**) contacted the Bank in January 2025 related to Plaza 106's default. Defendants deny the remaining allegations contained in paragraph 12 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

5

13.     Despite the cashflow challenges, Plaza 106 was focused on catching up on payments. Between October 2024 and January 2025, Mr. Reddy made five separate deposits of $17,705.57 each into Plaza 106's business checking account at FUB—the same account subject to the auto-debit authorization under the Loan Agreement—totaling $88,527.85. Each deposit matched the monthly payment amount displayed on the loan portal. Three of these deposits were made on January 3, 2025. (Doc 83 ¶4.)

**ANSWER:** Defendants admit that after the Bank sent a Notice of Default and Acceleration on September 25, 2024, five separate deposits of $17,705.57 were made to Plaza 106's business checking account at the Bank between October 2024 and January 2025. Defendants further aver that three of these deposits were made on January 3, 2025. Defendants aver that the Business Loan Agreement speaks for itself and denies all allegations inconsistent therewith. Defendants deny the remaining allegations contained in paragraph 13 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

14.     After making the January 3, 2025 payments, Mr. Reddy attempted to meet with FUB to discuss the status of the loan. Mr. Reddy spoke briefly with Don Rudy, Vice President of FUB, who stated that the bank was not willing to discuss further.

**ANSWER:** Defendants admit that three deposits (not loan payments) were made to Plaza 106's business checking account at the Bank on January 3, 2025. Defendants further admit that Don Rudy spoke with Mr. Reddy in early January 2025. Defendants deny the remaining allegations contained in paragraph 14 of the Complaint.

15.     On January 21, 2025, FUB's automated system debited $17,705.57 from Plaza 106's business checking account ("Transaction 1"). The debit was not initiated by Mr. Reddy.

6

4903-0951-9785

FUB did not apply the funds to the loan account. On or about February 5, 2025, FUB reversed the transaction through a "Payment Refund" entry—fifteen days after the original debit. (Doc 83 ¶6.)

**ANSWER:** Defendants admit that on January 21, 2025, an amount of $17,705.57 was debited from Plaza 106's business checking account at the Bank. Defendants admit that the payment was reversed on February 4, 2025, and an amount of $17,705.57 was credited to Plaza 106's business checking account at the Bank. Defendants further admit that no amount was applied to Plaza 106's defaulted loan during this time. Defendants deny the remaining allegations contained in paragraph 15.

16. Mr. Reddy was not aware of Transaction 1 at the time it occurred or when it was reversed. He discovered the transaction and its reversal in mid-February 2025 while reviewing account records.

**ANSWER:** Defendants deny the allegations contained in paragraph 16 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

17. Around February 11, 2025, Mr. Reddy received a text message from the Suite B tenant, Shreyas Makam, showing a picture of the Notice of Trustee's Sale (NOS1) posted on the tenant's door at the Property. Suite B stopped paying rent from that time onwards. Suite C tenant, Eddee Johansen, also stopped paying rent consistently, later sending an email to Mr. Reddy attributing the delay to the Notice of Trustee's Sale. Both working HVAC machines at the Property also stopped working in the coming months.

**ANSWER:** Defendants deny the remaining allegations contained in paragraph 17 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof. To the extent paragraph 17 is intended to suggest that Plaintiff did not receive service of

4903-0951-9785

the Notice of Trustee's Sale in or around February 2025, Defendants deny any such suggestion as Plaintiff Plaza 106 LLC was served.

18. Mr. Reddy and Plaza 106 began exploring Chapter 11 as a protective measure. During this process, Mr. Reddy noticed transaction irregularities on the business checking account —specifically, Transaction 1.

**ANSWER:** Defendants deny the allegations contained in paragraph 18 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

19. On February 19, 2025, Mr. Reddy called Defendant Michael Brown at Parsons Behle & Latimer and requested a meeting. Mr. Reddy was not aware the bank would also attend.

**ANSWER:** Defendants admit that Mr. Reddy called Brown in February 2025 to request a meeting. Defendants deny the remaining allegations contained in paragraph 19 of the Complaint.

20. On February 20, 2025, FUB's automated system debited $17,705.57 from Plaza 106's business checking account (Transaction 2). The debit was not initiated by Mr. Reddy.

**ANSWER:** Deny.

21. On the same day, Mr. Reddy met with Brown, Don Rudy, and Dillon George at Parsons Behle & Latimer's office. The meeting lasted approximately three hours. Both Transaction 1 and Transaction 2 were discussed. (Doc 83 ¶8.)

**ANSWER:** Defendants admit that Mr. Reddy, Brown, Don Rudy, and Dillon George met at the offices of Parsons Behle & Latimer on or about February 20, 2025. Defendants further admit that the meeting lasted approximately three hours. Defendants deny Plaza 106's definition of "Transaction 2" and that such a transaction ever occurred. Defendants deny the remaining allegations contained in paragraph 21 of the Complaint.

8

4903-0951-9785

22. During the meeting, Brown acknowledged that the foreclosure was irregular in light of the bank's acceptance of the February 20 payment after the Notice of Trustee's Sale had been filed, and indicated that he would cancel the foreclosure. Brown also asked Mr. Rudy about the January 21, 2025 transaction. Mr. Rudy responded to the effect of "I don't know" or "I don't remember." Mr. Rudy later testified under oath at the evidentiary hearing that he was "intimately" familiar with the loan account. During the meeting, Mr. Rudy also stated words to the effect of: "if the notices were defective, the bank could cancel them and reissue them tomorrow." Mr. George was more reconciliatory and suggested that Mr. Reddy obtain a quick takeout loan before the bank took action to pursue foreclosure once again. (Doc 83 ¶8.)

**ANSWER:** Responding to the allegations of paragraph 22, Defendants admit the meeting took place and that the referenced foreclosure was discussed during the meeting. Defendants deny the remaining allegations in paragraph 22, including Plaintiff's characterizations and quotations of those discussions.

23. On or about February 24 or 25, 2025, Mr. Reddy called Brown and insisted the bank apply the deducted funds to the loan. Brown became upset. Mr. Reddy stated that the funds had already been deducted from the business bank account and that the memo line on the online portal stated the deduction was for payment for loan 4200. Mr. Reddy insisted that the deducted amount should be applied to the loan as the memo line stated. He further questioned Brown by asking if the funds are not applied to the loan, does the bank even have any right to deduct from a depositor's account? Doesn't this amount to conversion? Brown stated he would get back to Mr. Reddy. (Doc 83 ¶9.)

**ANSWER:** Responding to the allegations of paragraph 23, Defendants admit a call between Mr. Reddy and Brown occurred on or about the referenced dates. Defendants deny Plaintiff's recitation of what was discussed during the call and the characterizations of the same.

24.     From that point onwards, Mr. Reddy checked the online banking portal daily to see whether the deducted funds were being applied to the loan. On February 28, 2025, Mr. Reddy discovered his access to FUB's online banking portal had been disabled. Mr. Reddy called Brown. Brown did not inquire why Mr. Reddy had lost portal access—because, upon information and belief, he already knew. Brown stated words to the effect of: "the bank had taken too long to correct Transaction 1, and they were now working on Transaction 2." Mr. Reddy understood this to mean that the bank would be applying the funds to the loan. (Doc 83 ¶10.)

**ANSWER:** Defendants admit that Mr. Reddy called Brown on or about February 28, 2025. Defendants deny the remaining allegations contained in paragraph 24 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

25.     On or about March 3, 2025, portal access was restored to Mr. Reddy. By the time Mr. Reddy logged into the account, Transaction 2 had not been applied to the loan or returned to the checking account as Transaction 1 had been. It had been completely erased from the record. There was no reversal entry. There was no refund memo. There was no trace of the transaction. (Doc 83 ¶11.)

**ANSWER:** Defendants deny that "Transaction 2" as defined by Plaza 106 ever occurred— *i.e.*, that funds were applied to the loan from the checking account in the event Plaintiff describes as "Transaction 2." Defendants assert that because no such event occurred according to the Bank statements on file, there was no need for a "reversal entry" or a "refund memo," as alleged by

10

Plaintiff. Defendants deny the remaining allegations contained in paragraph 25 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

26.     Mr. Reddy called Brown shortly after regaining portal access and raised the issue of the erased Transaction 2. Brown was dismissive, stating words to the effect of: "how much have you lost for eight days—maybe ten dollars worth of interest." Mr. Reddy told Brown that tenants had stopped paying rent as a result of the Notice of Trustee's Sale posted on tenant doors. Brown responded with words to the effect of: "can you prove causation?" (Doc 83 ¶11.)

**ANSWER:**  Defendants admit Mr. Reddy called Brown on or about March 3, 2025. Defendants deny the remaining allegations contained in paragraph 26 of the Complaint, including Plaintiff's recitation of what the parties discussed on the referenced call.

27.     Shortly thereafter, Mr. Reddy retained attorney Nathan Eaton. Mr. Eaton sent a settlement communication to Brown on behalf of Plaza 106 that specifically referenced both Transaction 1 and Transaction 2. (Doc 83 ¶12.)

**ANSWER:**  Defendants admit Brown received a written communication from Nathan Eaton. Defendants aver that the communication from Mr. Eaton speaks for itself and denies all allegations inconsistent therewith. Defendants deny the remaining allegations contained in paragraph 27 of the Complaint.

28.     FUB sent a Notice of Intent to File Notice of Default on March 11, 2025. FUB initiated a second Notice of Default and Election to Sell (NOD2) on April 17, 2025, and a second Notice of Trustee's Sale (NOS2) for September 16, 2025. (Doc 9 ¶¶9-11; Doc 43/44 ¶¶9-11.)

11

4903-0951-9785

**ANSWER:** Answering paragraph 28 of the Complaint, Defendants aver that the second Notice of Default and Election to Sell and Notice of Trustee's Sale speak for themselves and deny all allegations inconsistent therewith.

29.   The tenant payment disruptions caused by the posting of NOS1 made it difficult for Plaza 106 to pursue any meaningful refinancing efforts. Following Mr. George's suggestion at the February 20 meeting, Mr. Reddy explored private lending options. However, even a higher interest private lender would need operating leases in place. While Mr. Reddy could have evicted and replaced Suite B and Suite C tenants in 3 months, that would give no time for a private lender to close on a short term loan. The NOS trapped Plaza 106 between non-paying tenants and the need to show active leases for refinancing. Plaza 106 filed for Chapter 11 bankruptcy on September 15, 2025. (Doc 43/44 ¶11.)

**ANSWER:** Defendants deny the allegations contained in paragraph 29 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

30.   In its Motion for Relief from Stay (Doc 9 ¶17), FUB represented to this Court that "the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale." In Doc 9 ¶18, FUB represented that "Discussions between the Debtor and Movant broke down and the Debtor remained in default."

**ANSWER:** Answering paragraph 30 of the Complaint, Defendants aver that the Motion for Relief from Stay speaks for itself and deny all allegations inconsistent therewith.

31.   At the evidentiary hearing on February 5, 2026, FUB's own witness Mr. Rudy testified under oath that the cancellation was caused by "a payment that was taken ... it was done

12

4903-0951-9785

in mistake by the bank and reversed and put back and ... that's what caused the foreclosure to be restarted." (Transcript, p. 85; Doc 83, Ex. 2.)

**ANSWER:** Answering paragraph 31 of the Complaint, Defendants aver that the transcript speaks for itself and deny all allegations inconsistent therewith

32. At the same hearing, Mr. Rudy denied knowledge of Transaction 2 four times under oath, despite having discussed it at the February 20, 2025 meeting for approximately three hours. (Doc 83 ¶14.)

**ANSWER:** Answering paragraph 32 of the Complaint, Defendants aver that the transcript speaks for itself and deny all allegations inconsistent therewith.

33. Monthly statements for the loan account that had previously been available on the portal were removed or restricted during February 2026, during the period of the evidentiary hearing. The past due amounts on three separate dates are exact multiples of $17,705.57, but as of February 4, 2026, the loan shows 16 payments past due instead of 18—a shortfall of exactly $35,411.14, two payments. (Doc 83 ¶13.)

**ANSWER:** Defendants deny that Plaza 106's access to the monthly statements on the Bank's online banking portal were removed or restricted during February 2026. Defendants admit that Plaza 106's loan was 18 payments past due as of February 4, 2026. Answering paragraph 33 of the Complaint, Defendants aver that the monthly statements for Plaza 106's loan account speak for themselves and deny all allegations inconsistent therewith. Defendants deny all remaining allegations contained in paragraph 33 of the Complaint.

34. FUB filed its Motion for Relief from Stay (Doc 9) on October 16, 2025. Following an evidentiary hearing on February 5, 2026, and a ruling on March 2, 2026, this Court granted the

13

4903-0951-9785

Motion (Doc 54). Brown then signed a Notice of Trustee's Sale (NOS3) on March 17, 2026, scheduling the sale of the Property for April 21, 2026.

**ANSWER:** Answering paragraph 34 of the Complaint, Defendants aver that the Motion for Relief from Stay, Order granting the Motion for Relief from Stay, and Notice of Trustee's Sale speak for themselves and deny all allegations inconsistent therewith.

**COUNT 1**
**Strict Liability Under UCC Midnight Deadline**
**(Utah Code § 70A-4-302, § 70A-4-215)**
Against Defendant First Utah Bank

35.     Plaintiff incorporates ¶¶1-34 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

36.     FUB is a payor bank as defined under Utah Code § 70A-4-105.

**ANSWER:** Paragraph 36 of the Complaint contains legal conclusions for which no factual response is required.

37.     FUB's automated system debited $17,705.57 from the Debtor's checking account on January 21, 2025 (Transaction 1) and again on February 20, 2025 (Transaction 2).

**ANSWER:** Defendants admit that the Bank's automated system debited $17,705.57 from Plaza 106's business checking account on January 21, 2025. Defendants deny the remaining allegations contained in paragraph 37 of the Complaint.

38.     Under § 70A-4-302, a payor bank that retains a demand item past its midnight deadline is accountable for the amount of the item, "whether properly payable or not."

**ANSWER:** Paragraph 38 of the Complaint contains legal conclusions for which no factual response is required.

14

4903-0951-9785

39.     Transaction 1 became final under § 70A-4-215 at midnight on January 22, 2025. FUB did not return or reverse the item until February 5, 2025—fifteen days past the midnight deadline.

**ANSWER:** Defendants admit that the transaction on January 21, 2025 was reversed on February 4, 2025, crediting Plaza 106's business checking account in the amount of $17,705.57. The remaining allegations in paragraph 39 of the Complaint contain legal conclusions for which no factual response is required.

40.     Transaction 2 became final under § 70A-4-215 at midnight on February 21, 2025. FUB did not return the item—it deleted it entirely.

**ANSWER:** Deny.

41.     Under § 70A-4-302, FUB is strictly liable for the face amount of both transactions—$35,411.14. The statute imposes liability on a payor bank that retains an item past the midnight deadline, "whether properly payable or not." No proof of actual damage is required.

**ANSWER:** Paragraph 41 of the Complaint contains legal conclusions for which no factual response is required.

42.     Non-judicial foreclosure is not conducted under the supervision of a court of law; accordingly, strict compliance with the statute is required. Utah Code §§ 57-1-10 through 57-1-36. A Notice of Default stating a default amount that does not credit a legally finalized payment is defective.

**ANSWER:** Paragraph 42 of the Complaint contains legal conclusions for which no factual response is required.

43.     The Notice of Sale signed by Brown on March 17, 2026 flows from the defective Notice of Default. The stated default amount is overstated by at least $35,411.14—two finalized payments that were never credited to the loan.

**ANSWER:** Deny.

**COUNT 2**
**Bad Faith**
**(Utah Code § 70A-4-103)**
Against Defendant First Utah Bank

44.     Plaintiff incorporates ¶¶1-43 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

45.     Under § 70A-4-103, a bank cannot disclaim responsibility for its lack of good faith or failure to exercise ordinary care.

**ANSWER:** Paragraph 45 of the Complaint contains legal conclusions for which no factual response is required.

46.     FUB acted in bad faith across both transactions. As to Transaction 1: FUB's automated system debited $17,705.57 on January 21, 2025. Under the midnight deadline, that payment was final by January 22. FUB reversed it fifteen days later. Even under normal conditions, reversing a finalized transaction fourteen days past the deadline is irregular and contrary to ordinary care. But FUB was not operating under normal conditions—it was actively advancing a foreclosure against the Debtor. FUB had a heightened responsibility to account accurately for payments received while pursuing a non-judicial sale of the Debtor's property. Despite that, the bank unilaterally reversed a payment that had been final for fourteen days. NOS1—posted on tenant doors in February 2025—was already defective before Transaction 2 even occurred.

16

4903-0951-9785

**ANSWER:** Paragraph 46 of the Complaint contains legal conclusions for which no factual response is required.  Defendants deny all other allegations.

47.     As to Transaction 2: FUB debited the same amount on February 20, 2025. By February 21, the payment was final. Eight days later, FUB blocked the Debtor's portal access and deleted the transaction without a trace—no reversal entry, no refund memo, no record. The deletion of a second finalized transaction, while concealing the act from the customer, is not an isolated error. It confirms the intent of the bank and its bad faith across both transactions.

**ANSWER:** Paragraph 47 of the Complaint contains legal conclusions for which no factual response is required.  Defendants deny all other allegations.

48.     Under § 70A-4-103(e), if there is bad faith, damages include "any other damages the party suffered as a proximate consequence." The consequential damages flowing from this conduct include: defective Notice of Default, defective Notice of Sale, tenant disruption leading to inability to refinance, and the Debtor's Chapter 11 filing itself.

**ANSWER:** Paragraph 48 of the Complaint contains legal conclusions for which no factual response is required. To the extent a factual response is required, Defendants deny the allegations contained in paragraph 48 of the Complaint.

### COUNT 3
### Spoliation of Evidence
Against Defendant First Utah Bank

49.     Plaintiff incorporates ¶¶1-48 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

50.     FUB had a duty to preserve Transaction 2 as a finalized financial record. Under § 70A-4-406, banks must retain the capacity to furnish legible copies for seven years.

17

4903-0951-9785

**ANSWER:** Paragraph 50 of the Complaint contains legal conclusions for which no factual response is required.

51.    FUB destroyed Transaction 2 by deleting it from the customer-facing portal while blocking the Debtor's access to the account. There was no reversal entry, no refund memo, no trace.

**ANSWER:** Deny.

52.    The deletion was intentional, not inadvertent. FUB blocked portal access on February 28, 2025, deleted the record, and restored access on March 3, 2025.

**ANSWER:** Deny.

53.    Plaintiff is entitled to an adverse inference that the destroyed record would have been unfavorable to FUB.

**ANSWER:** Paragraph 53 of the Complaint contains legal conclusions for which no factual response is required, but nevertheless denies that Plaintiff is entitled to any relief.

### COUNT 4
### Breach of Deposit Agreement
Against Defendant First Utah Bank

54.    Plaintiff incorporates ¶¶1-53 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

55.    FUB and Plaza 106 entered into a written deposit agreement governing the checking account.

**ANSWER:** Admit. Defendants aver that any such written deposit agreement speaks for itself.

18

4903-0951-9785

56.     FUB breached the deposit agreement by reversing Transaction 1 without authorization, deleting Transaction 2 without any accounting entry, and blocking the Debtor's access to the online banking portal during the period of alteration.

**ANSWER:** Deny.

57.     Plaza 106 suffered damages as a direct and proximate result of these breaches, including irregular foreclosure, damaged tenant relationships, inability to refinance, and finally seeking bankruptcy protection which itself was deprived.

**ANSWER:** Deny.

### COUNT 5
### Breach of Trustee's Duty of Good Faith
Against Defendant Michael R. Brown

58.     Plaintiff incorporates ¶¶1-57 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

59.     As successor foreclosure trustee, Brown owed a duty of good faith to both the beneficiary and the trustor.

**ANSWER:** Paragraph 59 of the Complaint contains legal conclusions for which no factual response is required.

60.     From February 28, 2025 onwards, Brown's conduct was that of a party conspiring with the bank rather than a neutral foreclosure trustee. His dismissal of the Debtor's concerns about the deleted transaction, his interactions with attorney Nathan Eaton on behalf of FUB, his execution of the second Notice of Default and Notices of Trustee's Sale, his participation in the Motion for Relief from Stay, and his silence at the evidentiary hearing are all inconsistent with the good faith obligations of a foreclosure trustee.

4903-0951-9785

**ANSWER:** Paragraph 60 of the Complaint contains legal conclusions for which no factual response is required. Defendants deny all other allegations.

61. Brown signed the second Notice of Default (NOD2) on April 17, 2025, the second Notice of Trustee's Sale (NOS2) for September 16, 2025, and a third Notice of Trustee's Sale (NOS3) on March 17, 2026, scheduling the sale of the Property for April 21, 2026. At the time Brown signed each of these Notices, he knew that Transaction 1 had been improperly reversed and Transaction 2 had been deleted. He knew the default amounts did not credit two finalized payments totaling $35,411.14.

**ANSWER:** Answering paragraph 61 of the Complaint, Defendants aver that the second Notice of Default, second Notice of Trustee's Sale, and third Notice of Trustee's Sale speak for themselves and deny all allegations inconsistent therewith. Defendants deny all other allegations.

62. Brown also stood silently at the evidentiary hearing while Mr. Rudy denied knowledge of Transaction 2 under oath—facts Brown knew to be false from personal involvement. A trustee who allows false testimony about the amounts owed on the very debt he is foreclosing is not a neutral fiduciary—he is a participant in the scheme.

**ANSWER:** Paragraph 62 of the Complaint contains legal conclusions for which no factual response is required. Defendants deny all other allegations.

63. Brown's conduct throughout was anything but neutral. A trustee who proceeds with a foreclosure based on amounts he knows are wrong breaches his duty of good faith to the trustor.

**ANSWER:** Paragraph 63 of the Complaint contains legal conclusions for which no factual response is required. Defendants deny all other allegations.

4903-0951-9785

**COUNT 6**
**Tortious Interference with Economic Relations**
Against Defendant First Utah Bank

64.    Plaintiff incorporates ¶¶1-63 by reference.

**ANSWER:**  Defendants incorporate their responses to the preceding paragraphs.

65.    Plaza 106 had existing economic relationships with its tenants at the Property, including Suite B and Suite C.

**ANSWER:**  Defendants deny the allegations contained in paragraph 65 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

66.    FUB posted NOS1 on the tenant doors at the Property. Both Tenant B and Suite C directly attributed their non-payment to the posted notice.

**ANSWER:**  Responding to the allegations of paragraph 66, the Bank admits that it caused the Notice of Trustee's Sale to be posted at the Property in compliance with Utah law. Defendants deny the remaining allegations contained in paragraph 66 of the Complaint for lack of knowledge or information sufficient to form a belief as to the truth or falsity thereof.

67.    FUB's conduct was intentional and improper. The posting was based on a foreclosure process built on a defective NOD flowing from UCC violations established in Counts 1 and 2.

**ANSWER:**  Paragraph 67 of the Complaint contains legal conclusions for which no factual response is required.  Defendants deny all other allegations.

68.    As a direct and proximate result of FUB's conduct, Plaza 106 lost rental income, was unable to replace tenants due to the pending foreclosure, and was unable to refinance the Property.

4903-0951-9785

**ANSWER:** Paragraph 68 of the Complaint contains legal conclusions for which no factual response is required. To the extent a factual response is required, Defendants deny the allegations contained in paragraph 68 of the Complaint.

**COUNT 7**
**Violation of Statutory Duty / Conspiracy to Defraud Trustor**
**(Utah Code § 57-1-25(5))**
Against Defendants First Utah Bank and Michael R. Brown

69.  Plaintiff incorporates ¶¶1-68 by reference.

**ANSWER:** Defendants incorporate their responses to the preceding paragraphs.

70.  Under § 57-1-25(5), a person who "assists in, conspires to commit, or solicits the commission of any act to defraud or deceive, or which would operate to defraud or deceive, a trustor" is liable to the trustor.

**ANSWER:** Paragraph 70 of the Complaint contains legal conclusions for which no factual response is required.

71.  Brown, as successor foreclosure trustee, participated in and had knowledge of the bank's alteration of Transaction 1 and deletion of Transaction 2. Brown attended the February 20, 2025 meeting, communicated with the bank throughout the period of deletion, knew the bank's plan of action, dismissed the Debtor's concerns, and proceeded to sign NOS3 based on records he knew were inaccurate.

**ANSWER:** Deny.

72.  FUB altered, deleted, and concealed financial records relating to the loan secured by the Deed of Trust on the Property, inflating the default amount and enabling the foreclosure.

**ANSWER:** Deny.

22

73.     Brown and FUB acted in concert to defraud the trustor and are jointly and severally liable.

**ANSWER:**  Deny.

### COUNT 8
### Fraud on the Court
### (Fed. R. Civ. P. 60(d)(3) via Bankr. R. 9024)
Against Defendants First Utah Bank and Michael R. Brown

74.     Plaintiff incorporates ¶¶1-73 by reference.

**ANSWER:**  Defendants incorporate their responses to the preceding paragraphs.

75.     The Supreme Court has held that where officers of the court participate in the fabrication or presentation of fraudulent materials to a court, the resulting judgment may be vacated for fraud on the court. The doctrine exists to protect the integrity of the judicial process itself.

**ANSWER:**  Paragraph 75 of the Complaint contains legal conclusions for which no factual response is required.

76.     The Tenth Circuit has defined fraud on the court as "fraud which is directed to the judicial machinery itself"—"where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function—thus where the impartial functions of the court have been directly corrupted."

**ANSWER:**  Paragraph 76 of the Complaint contains legal conclusions for which no factual response is required.

77.     External fraud—fraud that prevents a party from presenting his case to the court— is a recognized basis for vacatur.

23

**ANSWER:** Paragraph 77 of the Complaint contains legal conclusions for which no factual response is required.

78. Brian M. Rothschild (USB #15316) is a member of the Utah State Bar and an officer of this Court. He signed and filed the Motion for Relief from Stay (Doc 9) on behalf of FUB.

**ANSWER:** Admit.

79. Michael R. Brown (USB #16007) is a member of the Utah State Bar and an officer of this Court. He served as successor foreclosure trustee and as counsel for FUB throughout the events described herein.

**ANSWER:** Admit.

80. In Doc 9 ¶17, Mr. Rothschild represented to this Court that "the Debtor began discussions with the Movant and the Movant recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale." In Doc 9 ¶18, Mr. Rothschild represented that "Discussions between the Debtor and Movant broke down and the Debtor remained in default."

**ANSWER:** Answering paragraph 80 of the Complaint, Defendants aver that the Motion for Relief from Stay speaks for itself and deny all allegations inconsistent therewith.

81. These representations were false, or at best, contained material omissions. FUB's own witness, Don Rudy, Vice President of the Bank, testified under oath at the evidentiary hearing on February 5, 2026 that the cancellation was caused by "a payment that was taken ... it was done in mistake by the bank and reversed and put back and ... that's what caused the foreclosure to be restarted."

24

**ANSWER:** Responding to the allegations of paragraph 81, Defendants aver that Mr. Rudy's testimony at the February 5, 2026 evidentiary hearing speaks for itself and deny all allegations inconsistent therewith. Defendants deny the remaining allegations of paragraph 81.

82. The cancellation was not caused by "discussions." It was caused by a bank-initiated transaction that the bank then reversed. Mr. Rothschild's representation in Doc 9 concealed the existence and significance of both transactions from this Court.

**ANSWER:** Deny.

83. Brown is not a bystander. Brown attended the February 20, 2025 meeting at Parsons Behle & Latimer where both Transaction 1 and 2 were discussed for approximately three hours. Brown acknowledged the foreclosure was irregular. Brown communicated, upon information and belief, with the bank during the period of deletion. Brown told the Debtor on February 28, 2025 that "the bank is working on it" while the Debtor's portal access was blocked and Transaction 2 was being erased. Brown dismissed the Debtor's concerns about the deleted transaction as "maybe ten dollars worth of interest."

**ANSWER:** Deny.

84. Brown then stood silently while Rothschild filed Doc 9 representing to this Court that the cancellation was due to "discussions"—a representation Brown knew to be false based on his personal involvement in the events.

**ANSWER:** Deny.

85. Brown stood silently while Rudy denied knowledge of Transaction 2 four times under oath at the evidentiary hearing—despite Brown having personally discussed Transaction 2

with the Debtor on multiple occasions and having been present at the February 20, 2025 meeting where Rudy himself participated in a three-hour discussion of both transactions.

**ANSWER:** Deny.

86.     This is not nondisclosure by a party or witness, which alone would not constitute fraud on the court. This is an attorney—an officer of this Court—who had personal knowledge of the truth, who participated in the concealment of records from the Debtor, and who then allowed false representations and false testimony to be presented to this Court without correction. Since attorneys are officers of the court, their conduct, if dishonest, constitutes fraud on the court.

**ANSWER:** Deny.

87.     Brown's conduct constituted external fraud as distinguished from internal fraud. External fraud is fraud that prevents a party from presenting his case to the court. Brown blocked the Debtor's access to the very records that would have revealed the bank's scheme. Brown told the Debtor "the bank is working on it" while those records were being deleted. Brown dismissed the Debtor's concerns as trivial. By the time the Debtor regained access to his account and discovered the full scope of the alteration, the records had been erased.

**ANSWER:** Deny.

88.     This Court relied on the representations in Doc 9 and on the testimony at the evidentiary hearing in granting the Order for Relief from Stay (Doc 54). The Court's impartial function was directly affected. The Court was not presented with the facts it was entitled to have— that the cancellation was caused by a bank-initiated transaction, not by "discussions," and that a second transaction had been deleted from the records entirely.

**ANSWER:** Deny.

4903-0951-9785

89.     The loan account independently corroborates the scheme. As of February 4, 2026, the loan shows 16 payments past due instead of 18—a shortfall of exactly $35,411.14, two payments. If Transaction 1 was reversed to the checking account and Transaction 2 was deleted from the checking account, neither should have affected the loan account. Yet the loan account is short by exactly two payments. The only logical explanation is that records on the loan account were also altered.

**ANSWER:** Deny.

90.     This is not a single false statement. It is a coordinated sequence of acts by an officer of this Court in concert with FUB: alter Transaction 1 → post NOS1 on tenant doors → debit Transaction 2 → block portal access → delete Transaction 2 → dismiss the Debtor's concerns → file Doc 9 representing "discussions" as the cause → allow Mr. Rudy to deny Transaction 2 under oath → obtain stay relief → sign NOS3 based on records Brown knew were wrong. At every stage, an officer of this Court participated.

**ANSWER:** Deny.

91.     Doc 54, Order Granting First Utah Bank's Motion for Relief from Stay, was procured by fraud on the court. Plaintiff requests that this Court vacate the Order under Fed. R. Civ. P. 60(d)(3) via Bankr. R. 9024.

**ANSWER:** Deny.

Defendants deny any and all allegations not specifically admitted above.

## RESPONSE TO PRAYER FOR RELIEF

Defendants deny Plaintiff is entitled to any of the relief it seeks against Defendants in its Prayer for Relief.

4903-0951-9785

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's statutory claims are barred to the extent no private right of action exists to enforce the asserted claims.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's statutory claims are barred because Plaintiff lacks statutory standing under any identified statute to assert a claim against Defendants.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver, estoppel, promissory estoppel, laches, and/or acquiescence.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to plead claims based on fraud with sufficient particularity.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by consent.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Defendants at all times complied and/or substantially complied with all applicable statutes, regulations, and laws.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that it failed to mitigate the injury or damages alleged in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims fail due to the lack of actual damages.

4903-0951-9785

### ELEVENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims fail because any alleged damages Plaintiff suffered were caused by the conduct or actions of Plaintiff itself—not Defendants.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in party, from any recovery or relief by the equitable doctrine of unclean hands.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff accepted the reversed payment to its business checking account on February 4, 2025. Accordingly, his claims based on the same are barred by the doctrine of acceptance.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are subject to monetary damages that would constitute an adequate remedy at law. Accordingly, it has no basis for equitable or injunctive relief.

### FIFTEENTH AFFIRMATIVE DEFENSE

At all times, Defendants acted in good faith and in accordance with reasonable commercial standards and had reasonable grounds to believe that no violation of any applicable law, statute, and/or regulation occurred.

### SIXTEENTH AFFIRMATIVE DEFENSE

The Complaint, and each purported cause of action contained therein, is barred because the alleged conduct of Defendants and their agents were not willful, intentional, or knowing.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are preempted in whole or in part because they seek to impose requirements on the Bank that are different from and greater than those imposed by federal regulations.

4903-0951-9785

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that any damages sought are too speculative or remote.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's recovery, if any, is barred in whole or in part by the doctrine of setoff, offset, or equitable recoupment.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrine of laches by reason of its own actions or failure to act.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by res judicata and/or collateral estoppel.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The relief sought by plaintiff is barred in whole or in part based on the defenses of fraud or illegality.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the de minimis doctrine.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the alleged damages, if any are proven, were not proximately caused by any act or omission of Defendants.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine.

4903-0951-9785

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail, in whole or in part, due to the doctrine of prior breach or the first breach rule.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, under Utah Code Ann. § 70A-4-302(2).

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Defendants give notice that they intend to rely upon such other defenses as may become available by law, or pursuant to statute, or during any further discovery proceedings of this case, and Defendants hereby reserve the right to amend this Answer and assert such defenses.

### COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Counterclaim plaintiff and third-party plaintiff First Utah Bank (the "**Bank**"), by and through counsel, counterclaims against counterclaim defendant Plaza 106, LLC ("**Plaza 106**") and complains against third-party defendant Nagendra Prasad Reddy ("**Mr. Reddy**") as follows:

### PARTIES, JURISDICTION, AND VENUE

1. First Utah Bank is a Utah corporation with its principal place of business in Salt Lake City, Utah.

2. Plaza 106, LLC is a Utah limited liability company and is the debtor in the above-captioned case.

3. Nagendra Prasad Reddy is an individual who, upon information and belief, resides in Salt Lake City, Utah.

4. The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157.

5. Venue is proper in this District under 28 U.S.C. § 1409.

4903-0951-9785

GENERAL ALLEGATIONS

6.      On or about July 6, 2022, Plaza 106 submitted an application to the Bank for a business loan.

7.      As part of that application process, Plaza 106 provided three written leases to the Bank: two with Com Com Market, LLC, and one with Spice Heaven LLC.

8.      The written leases with Com Com Market, LLC were signed on July 1, 2022, and were for two spaces in commercial real estate owned by Plaza 106: a 3,227 square foot location and a 1,137 square foot location. The larger location leased for a monthly rent of $10,000 and the smaller location leased for a monthly rent of $3,000.

9.      The written lease with Spice Heaven LLC was signed on April 1, 2022, and was for a 2,140 square foot space and leased for a monthly rent of $5,000.

10.      All three written leases had a five-year term.

11.      On or about June 30, 2022, Mr. Reddy also signed an addendum to the Com Com Market, LLC lease for the larger, 3,227 square foot, location (the "**Addendum**").

12.      The Addendum included a provision that the "first installment of [$]10,000 will be paid by first week of July. Rest will be allocated based on expenses, but not to exceed 4 months."

13.      The Addendum contained a second provision that "tenant has option to terminate lease until June 30, 2023 for no charge."

14.      Plaza 106 did not disclose the Addendum to the Bank with the loan application.

15.      Upon information and belief, Reddy entered into lease addendums or side-agreements with at least one other tenant of Plaza 106 without disclosing the additional agreements to the Bank during the loan application process.

32

16.     The difference between these written leases as presented to the Bank with five-year terms and the leases including the side agreements that made the leases terminable at will, was material to the Bank's decision to extend credit.

17.     Based on Plaza 106's representations during the loan application process, including the representations related to the lease terms and income, the Bank and Plaza 106 entered into a Business Loan Agreement (the "**Loan Agreement**") (Exhibit A) on July 20, 2022.

18.     Under the Loan Agreement, the Bank loaned Plaza 106 a total amount of $2,750,000.00.

19.     Plaza 106 also executed a Promissory Note (the "**Note**") (Exhibit B) with the Bank. Fixed monthly payments were set at 119 payments of $17,705.57 and one final payment of $2,104,061.95.

20.     The Manager and Member of the Debtor, Mr. Reddy, signed a Commercial Guaranty (the "**Guaranty**") (Exhibit C) as a guarantor of the Note.

21.     Plaza 106 executed a Deed of Trust (the "**Deed of Trust**") (Exhibit D), providing a security interest in real property located at 894 East 3900 South, Salt Lake City, Utah 84107 (the "**Real Property**"), the leases of the Real Property, rents from the Real Property, and personal property.

22.     Plaza 106 also executed an Assignment of Rents further offering security in the form of rents from the Real Property ("**Assignment of Rents**") (Exhibit E).

23.     Plaza 106 stopped making monthly payments to the Bank under the Note in June 2024.

4903-0951-9785

24.     Plaza 106 filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2025 (the "**Petition Date**").

25.     As of the Petition Date, the total amount Plaza 106 and Mr. Reddy owed to the Bank was $3,214,021.13.

26.     On September 25, 2024, the Bank sent a Notice of Default and Acceleration, accelerating the total amount due.

27.     After the first Notice of Default and Acceleration, the Bank initiated and recorded a Notice of Default and Election to Sell, dated November 1, 2024.

28.     The Bank also published and served a Notice of Trustee's Sale.

29.     Later, however, the Bank recorded a Cancellation of Notice of Default and cancelled the Trustee's Sale.

30.     The Bank sent a Notice of Intent to File Notice of Default on March 11, 2025.

31.     The Bank initiated and recorded a second Notice of Default and Election to Sell, dated April 17, 2025.

32.     Thereafter, the Bank published, caused to be posted, and served a Notice of Trustee's Sale for a sale scheduled for September 16, 2025.

33.     The day before the scheduled sale, Plaza 106 filed its petition for relief under chapter 11 of the Bankruptcy Code.

34.     On October 15, 2025, the Bank filed a Motion for Relief from Stay.

35.     The Bank subsequently commissioned an appraisal report of the Real Property. The resulting report valued the Real Property at $3,530,000.00 based in part on Reddy and Plaza 106's representations of the leases and omission of the Addenda thereto, and on representations in the

4903-0951-9785

record, which became exhibits that Defendants stipulated were authentic, including Exhibits 18-21 (the incomplete leases); Exhibit 22 (rent roll), Exhibits 23-24 (Plaza 106's heavily redacted bank statements), and both parties' appraisals, which were based on the incomplete leases.

36.   On March 2, 2026, the Court granted the Bank's Motion for Relief from Stay, allowing the Bank to "exercise all of its remedies under applicable law against its Collateral including th[e] . . . Real Property, the leases of the Real Property; rents from the Real Property; and all personal property related to the Real Property."

37.   On April 21, 2026, the Real Property was sold at public auction for the purpose of foreclosing on the Trust Deed.

38.   As of the date of the sale, April 21, 2026, the total amount Plaza 106 and Mr. Reddy owed to the Bank was $3,527,127.02.

39.   At the auction, the Bank credit bid $3,100,000 for the Real Property.

40.   The Bank's credit bid was the highest and best offer and was accepted by the trustee.

41.   Based on the credit bid and the amount due, there remained a deficiency claim of $427,127.02 as of the date of the sale.

42.   However, because the Bank's appraisal of the Real Property was based in part on Defendants' false representations related to the lease income and omission of the Addenda, the bid was artificially inflated over the actual value of the Real Property.

43.   As of the date of this Counterclaim, a deficiency remains after applying the actual value of the Real Property to the amounts due to the Bank, including the outstanding principal due

4903-0951-9785

under the Note and Guaranty, interest, and fees in an amount to be determined based on the actual value of the Real Property and the income realizable thereon.

44.     After purchasing the Real Property, the Bank demanded that Plaza 106 turn over and account for all rent collected post-petition from the Real Property.

45.     Plaza 106 has failed to turn over and account for rent collected post-petition.

## FIRST CAUSE OF ACTION
Deficiency Judgment – Plaza 106 and Reddy

46.     The Bank incorporates by reference each allegation contained in the Counterclaim as if fully set forth herein.

47.     Pursuant to the terms of the Deed of Trust, Plaza 106 pledged a security interest in the Real Property to the Bank as collateral for the Note.

48.     Mr. Reddy executed the Guaranty as a guarantor of the Note.

49.     Plaza 106 defaulted on the Note in June 2024.

50.     At that time, the Note had a principal balance of $2,636,920.72.

51.     Based on the default, the Bank initiated and recorded a second Notice of Default and Election to Sell.

52.     The Bank published and served a Notice of Trustee's Sale on April 17, 2025.

53.     At a public auction for the Real Property, the Bank credit bid $3,100,000 and the bid was accepted by the trustee.

54.     As of the date of the sale, April 21, 2026, the total amount Plaza 106 and Mr. Reddy owed to the Bank was $3,527,127.02.

55.     Based on the credit bid and the amount due, there remained a deficiency claim of $427,127.02 as of the date of the sale.  Nevertheless, the Bank's credit bid does not reflect the

4903-0951-9785

actual value of the Real Property, because the valuation was artificially inflated based on Plaza 106's false statements related to the lease income and failure to disclose the Addendum.

56.     A deficiency remains after applying the actual value of the Real Property, to the amounts due to the Bank, including the outstanding principal due under the Note and Guaranty, interest, and fees in an amount to be determined based on the actual value of the Real Property and the income realizable thereon.

57.     Accordingly, the Bank is entitled to a deficiency judgment in its favor and against Plaza 106, as Borrower, and Mr. Reddy, as Guarantor, jointly and severally, for the amount of the deficiency in an amount to be proven at trial.

<strong><u>SECOND CAUSE OF ACTION</u></strong><br>Declaratory Judgment/Breach of Agreement – Turn Over of Rents – Plaza 106

58.     The Bank incorporates by reference each allegation contained in the Counterclaim as if fully set forth herein.

59.     Pursuant to the terms of the Deed of Trust, Plaza 106 pledged a security interest in the leases and rents from the Real Property as collateral for the Note.

60.     Plaza 106 further executed an Assignment of Rents offering security in the form of rents from the Real Property.

61.     Under the Assignment of Rents, the Bank has the right to manage the Property, as well as receive and collect rents.

62.     Plaza 106 defaulted on the Note in June 2024.

63.     After purchasing the Real Property at a public auction, the Bank demanded that Plaza 106 turn over and account for all rent collected from the tenants of the Real Property after the Petition Date.

37

4903-0951-9785

64.     Plaza 106 has failed to turn over and account for rent collected post-petition such that the Bank can accurately determine the payment status for each tenant of the Real Property and realize on its security interest in the rents.

65.     Where the Bank is now the owner of the Real Property, and the rents are properly assigned to it as the property owner, as well as under the Assignment of Rents, Plaza 106 is required to assign the Bank all rents.

66.     Moreover, Plaza 106 is required to transfer to the Bank all post-Petition Date records related to payment of rent for the Bank to determine payment status for the tenants.

67.     Accordingly, the Bank is entitled to an order in its favor and against Plaza 106, as Borrower, and Mr. Reddy, as Guarantor, jointly and severally, requiring them to turn over and account for all rent collected after the Petition Date.

**THIRD CAUSE OF ACTION**
Mortgage Fraud – Plaza 106 and Reddy

68.     The Bank incorporates by reference each allegation contained in the Counterclaim as if fully set forth herein.

69.     During the loan application process, Plaza 106 and Reddy made a false statement about the terms of the leases and the lease income related to the Real Property by failing to disclose the Addendum.

70.     Plaza 106 and Reddy made the statements knowing they were false.

71.     Plaza 106 and Reddy intended that the Bank would rely on the statements.

72.     The Bank reasonably relied on Plaza 106's and Reddy's statements related to the leases' terms and the income, which were material to the Bank's credit decisions when entering into the Loan Agreement.

38

4903-0951-9785

73.     The Bank further reasonably relied on Plaza 106's and Reddy's statements related to the leases' terms and income when seeking an appraisal of the Real Property.

74.     The Bank suffered damages as a result of relying on the statements by, among other things, overbidding on the Real Property at the public auction.

## PRAYER FOR RELIEF

Wherefore, the Bank respectfully prays for judgment and relief as follows:

1.     A deficiency judgment against Plaza 106 and Mr. Reddy, jointly and severally, for the amount remaining unpaid after application of the actual value of the real property, along with the outstanding interest, fees, and costs.

2.     For judgment in favor of the Bank and against Plaza 106 for the rent payments and records related to the same for the tenants of the Real Property after the Petition Date.

3.     For judgment in favor of the Bank and against Plaza 106 for the amount that the Bank was damaged in overbidding on the Real Property based on Plaza 106's fraudulent statements made during the loan application process by failing to disclose the Addendum.

4.     For pre-judgment and post-judgment interest at the rates provided in the Note and Guaranty or as allowed by law;

5.     For all costs and reasonable attorneys' fees incurred in this action as provided in the Note and Guaranty or as allowed by law; and

6.     For such other and further relief as the Court deems just and proper.

4903-0951-9785

DATED: May 15, 2026

PARSONS BEHLE & LATIMER

/s/ *Zack L. Winzeler*

Zack L. Winzeler
Brian M. Rothschild
Whitney E. McKiddy

*Attorneys for Defendants, Counterclaim Plaintiff, and Third-Party Plaintiff*

4903-0951-9785

## CERTIFICATE OF SERVICE BY ELECTRONIC NOTICE (CM/ECF)

I hereby certify that on May 15, 2026, I electronically filed the foregoing **FIRST UTAH BANK'S ANSWER TO VERIFIED COMPLAINT FOR FRAUD ON THE COURT, CONSPIRACY TO DEFRAUD TRUSTOR, BREACH OF CONTRACT, UCC VIOLATIONS, SPOILATION OF EVIDENCE, AND INJUNCTIVE RELIEF** with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case, as identified below, are registered CM/ECF users.

**Brody Valerga on behalf of Plaintiff Plaza 106, LLC**
brodyvalerga@gmail.com, brodyvalerga@gmail.com

*/s/ Zack L. Winzeler*
Zack L. Winzeler

4903-0951-9785